NORTHERN NATURAL GAS COMPANY et al., Plaintiffs,

v.

Ralph GROUNDS and Henry Hitch, Jr. et al., Defendants.

CITIES SERVICE GAS COMPANY et al., Plaintiffs,

v.

MOBIL OIL CORPORATION et al., Defendants.

CITIES SERVICE GAS COMPANY et al., Plaintiffs,

v.

ASHLAND OIL AND REFINING COMPANY et al., Plaintiffs.

CITIES SERVICE GAS COMPANY, et al., Plaintiffs,

v.

COLUMBIAN FUEL CORPORATION et al., Defendants.

CITIES SERVICE GAS COMPANY et al., Plaintiffs,

v.

PAN AMERICAN PETROLEUM CORPORATION et al., Defendants.

NATIONAL HELIUM CORPORATION, Plaintiff,

v.

PANHANDLE EASTERN PIPE LINE COMPANY et al., Defendants.

Civ. A. Nos. KC–1969, KC–1945—KC–1948 and KC–1980.

United States District Court, D. Kansas.

Nov. 12, 1974.

950

Dale M. Stucky and Wayne Coulson, of Fleeson Gooing Coulson & Kitch, Wichita, Kan., Kramer Nordling Nordling & Fay, Hugoton, Kan., for Landowners.

Mark H. Adams, of Adams, Jones, Robinson & Malone, Wichita, Kan., for Northern Natural Gas Co., Northern Helex Co., Northern Gas Products Co., Cities Service Cryogenics, Inc., Cities Service Helex, Inc. and Cities Service Gas Co.

Emmet A. Blaes, of Jochems Sargent & Blaes, Wichita, Kan., for National Helium Corp. and Panhandle Eastern Pipe Line Co.

Richard Jones, of Hershberger, Patterson & Jones, Wichita, Kan., for Mapco Production Co., Mobil Oil Corp. and Superior Oil Co.

Gerald Sawatzky, of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Cabot Corp., Ashland Oil & Refining Co., Dorchester Gas Producing Co., Helmerich & Payne, Inc. and Texaco, Inc.

Robert J. Roth, U. S. Atty., Wichita, Kan., Wallace H. Johnson, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., David W. Miller, Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for United States.

Donald I. Mitchell, Wichita, Kan., for Federal Land Bank.

Glenn D. Young, Jr., of Gott, Hope, Gott & Young, Wichita, Kan., for Amoco Production Co.

Stanford J. Smith, of McMaster & Smith, Wichita, Kan., for Cities Service Oil Co.

Joseph Kennedy, of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for Phillips Petroleum Co.

Daniel R. Hopkins and Wm. J. Sears, Oklahoma City, Okl., for Cities Service Cryogenics, Inc., Cities Service Helex, Inc. and Cities Service Gas Co.

George B. Collins, of Collins & Collins, Wichita, Kan., for Diamond Shamrock Corp.

Wm. F. Pielsticker, Wichita, Kan., James B. Diggs, Oklahoma City, Okl., for Gulf Oil Corp.

H. O. Hickman and R. H. Landt, Denver, Colo., for Amoco Production Co.

Don Jemison, Bartlesville, Okl., for Phillips Petroleum Co.

Wendell J. Doggett and A. H. John LaForce, II, Houston, Tex., for National Helium Corp. and Panhandle Eastern Pipe Line Co.

Arloe W. Mayne and G. Fred Charles, Ashland, Ky., for Ashland Oil & Refining Co.

Leo Winters, Oklahoma City, Okl., Gene Stipe and Richard L. Gossett, McAlester, Okl., for Landowners.

William H. Tabb and Donald G. Canuteson, Dallas, Tex., for Mobil Oil Corp.

W. M. Sutton and H. A. Berry, of Underwood, Wilson, Sutton, Heare & Berry, Amarillo, Tex., for Diamond Shamrock Corp.

Philip R. Wimbish and Elmer W. Adams, Tulsa, Okl., for Texaco, Inc.

E. L. Creasey and Sam Riggs, Jr., Tulsa, Okl., for Cities Service Oil Co.

Eugene G. Bell, Tulsa, Okl., for Mapco Production Co.

Richard B. McDermott, of Boesche, McDermott & Eskridge, Tulsa, Okl., for Phillips Petroleum Co.

William R. Horkey and Leon C. Gavras, Tulsa, Okl., for Helmerich & Payne, Inc.

F. Vinson Roach and Patrick J. McCarthy, Omaha, Neb., for Northern Natural Gas Co., Northern Helex Co. and Northern Gas Products Co.

W. A. McWilliams, Oklahoma City, Okl., for Landowners.

W. E. Notestine, Amarillo, Tex., for Diamond Shamrock.

Homer D. Johnson, Roy Schaeffer, William C. Charlton, Pampa, Tex., for Cabot Corp.

R. T. Robberson, Houston, Tex., for Superior Oil Co.

C. A. Conoley, Kansas City, Mo., for National Helium Corp., Panhandle Eastern Pipe Line Co.

J. M. O'Loughlin, Houston, Tex., for Ashland Oil & Refining Co.

James R. Coffee and William J. Bonner, Dallas, Tex., for Atlantic Richfield.

## MEMORANDUM OF OPINION
## FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON REMAND

WESLEY E. BROWN, Chief Judge.

A. *Statement of the Case.*

This is a continuation of six consolidated interpleader actions filed in 1963, involving title to, and rights in the commodity or element known as "helium," which are reported as Northern Natural Gas Company v. Grounds, D.C., 292 F. Supp. 619, and Northern Natural Gas Company, et al. v. Grounds, 10 Cir., 441 F.2d 704 (1971), cert. den., 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267; 404 U.S. 1063, 92 S.Ct. 732, 30 L.Ed.2d 751; 404 U.S. 1065, 92 S.Ct. 732, 30 L.Ed.2d 754. The first trial of these actions, had in October 23, 1967—January 5, 1968, involved the ownership of helium contained in or extracted from natural gas produced from wells drilled in the Hugoton gas areas of Kansas, Oklahoma, and Texas. Further description of issues involved in these interpleader actions may be found in the reported decisions, *supra,* and will not be repeated except insofar as it may be necessary for discussion of issues which remain after remand to this court.

At the first trial, it was found that the Landowners did convey to their lessees all rights and title to helium contained in the natural gas stream, except those rights specifically reserved. It was further found that the Lessee-Producers, who sold and delivered gas to pipeline company purchasers, pursuant to gas purchase contracts, had likewise conveyed title to the helium component of the natural gas stream, and that the plaintiffs in interpleader, the helium extracting companies, or "Helex group" had title to the helium component of the natural gas stream. Northern Natural Gas Company v. Grounds, 292 F.Supp. 619, at 686–687.

On appeal, the Court of Appeals sustained these findings, ruling that, absent specific reservations, the grant of "gas" by the Landowners in their leases effectively conveyed all components of the natural gas stream, including helium, and that the gas sales contracts between the Lessee-Producers and the pipeline companies, likewise conveyed all components of the natural gas stream, including helium.[1]

On appeal from this court's determination that § 11 of the Helium Act Amendments, 50 U.S.C. § 167i, did not alter the scope of the gas purchase contracts, so as to allow the Lessee-Producers to share in revenues derived by the Helex companies from their sales of helium to the government, the Lessee-Producers successfully persuaded the Court of Appeals that they were entitled to compensation for the reasonable value of helium contained in the natural gas stream. The appellate court felt that the producers fell into a "void" between FPC regulated gas purchase contracts and the helium legislation regulated by the Bureau of Mines: (441 F.2d at 722–723):

Neither the FPC nor the Bureau of Mines has jurisdiction over the helium value of the natural gas. Although the gas purchase contracts have not been abrogated, the price provisions

---

1. This finding effectively disposed of two additional consolidated actions brought by landowners against the United States. (Nos. W–3009 and W–3159) These cases, brought under the Federal Tort Claims Act on the theory of conversion, and under the Tucker Act, 28 U.S.C. § 1346(a)(2) on the theory of "reverse condemnation," depended upon the premise that the landowners had not parted with title to the helium. See Northern Natural Gas Company v. Grounds, 441 F.2d 704, at 715.

thereof have been superseded by FPC rate regulation. The regulated lessee-producers must continue to sell the dedicated gas and have no statutory or contractual method of obtaining any benefit for the increased value. Two results are possible. The first is that the lessee-producers must deliver the gas at the FPC service rate, based on fuel value, and receive nothing for the helium value. *This produces a windfall for the pipelines and their Helex subsidiaries.* The second is that the lessee-producers are entitled to the reasonable value of the contained helium. This means that the landowners will receive royalties on the value of the helium produced from their lands and the lessee-producers will receive value for the helium content of the natural gas which has been produced by their efforts. We believe that satisfactory utility regulation requires the second result. Otherwise a utility rate may be used to obtain a commodity or service which is not within the contemplation of that rate. (Emphasis supplied.)

\* \* \* \* \* \*

In our opinion the reconciliation of the Natural Gas Act and of the 1960 amendments to the Helium Act to attain a symmetrical whole requires the conclusion that the FPC service rates do not apply to deny recovery for the contained helium which is processed in the separation plants. Hence, the lessee-producers recover from the fund the reasonable value of the helium content of the processed gas and they in turn must pay royalty thereon to the landowners. We believe that this result is a valid reconciliation of the statutes and a proper determination of the rights of the parties.

The Court of Appeals remanded the interpleader cases, with instructions that this court determine the reasonable value of the helium in question, which determination would be subject to review by the Court of Appeals.

### B. *Proceedings on Remand.*

After remand, the motion of the United States for leave to intervene as party plaintiff was sustained. [Dkt. 1410, 1429.] The United States is not a party defendant in any respect, and appears in these proceedings on remand solely for the purpose of attempting to prove that the reasonable value of the helium content of the natural gas processed in the helex plants is nominal. [Dkt. 1446, Complaint in Intervention.][2]

Atlantic Richfield Company, a lessee-producer, was also granted leave to intervene in these interpleader actions for the purpose of establishing its claim to a portion of the interpleaded funds. This claim is based upon alleged delivery of helium bearing natural gas which was ultimately processed for extraction by Northern Helex Company. The claim of Atlantic Richfield is designed to determine the status of those lessee-producers whose helium bearing natural gas was sold to others, but ultimately found its way into the conservation extracting plants by means of certain gas-exchange agreements between the pipeline companies and others.[3] [Dkts. 1592, 1601, 1609, 1610.]

---

2. The United States and Cities Service Helex, Inc. entered into the following stipulation, Dkt. 1653:

"The matter of indemnification by the United States of Cities Service Helex, Inc. for any payment of third party claims to helium in the Hugoton Area gas, as provided in Article 7.4 of the contract between the United States and the Cities Service Helex, Inc., dated August 22, 1961, is not in issue in this action. It is agreed that if Cities Service Helex, Inc. should hereafter seek indemnification against the United States under said contract, the United States agrees not to plead that such indemnification is barred by failure to raise the matter in this action.

The parties, by entering into this Stipulation, do not intend that it be used to assist or restrict either party in the presentation of any defenses to the cause of action litigated herein."

3. E. g., Atlantic Richfield gas, though sold to El Paso Natural Gas Company, was delivered into Northern's pipeline system for

Prior to trial on remand, this Court also made a determination that Phillips Petroleum Company was a member of the lessee-producer classes in Cases No. KC–1969 and KC–1980: [Dkt. 1614.]

. . . in view of the Mandate from the Court of Appeals, this Court can only conclude that Phillips remains in Cases Nos. KC–1969 and KC–1980 as a member of the class of lessee-producers, insofar as it may have delivered helium contained in gaseous streams to Northern Natural Gas Company (KC–1969) and Panhandle Eastern Pipe Line Company (KC–1980). Its right to share in any ultimate distribution from the interpleaded fund will of course depend upon the nature of its contractual arrangements with these two helex processing companies, and may very well require that the Court establish 'sub-classes' of lessee-producers in the process of making an allocation of any distribution from the fund which is ultimately ordered.

The plaintiffs in interpleader, the Helex group, filed Motions for Summary Judgment [Dkt. 1659] in these actions, upon the basis of the decision of the Supreme Court in Phillips Petroleum Company v. Texaco, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209, which reversed a decision of the Tenth Circuit, Texaco Inc. v. Phillips Petroleum Company (1973), 481 F.2d 70, to the effect that its opinion on the liability issue in these cases, Northern Natural Gas Company v. Grounds, *supra*, 441 F.2d 704, established that problems relating to recovery of the value of helium raise federal questions, sufficient to establish jurisdiction under 28 U.S.C. § 1331(a).[4] In finding that there was no "federal question" jurisdiction in *Phillips*, the Supreme Court made the following observation regarding *Grounds*, 415 U.S. at p. 128, 94 S.Ct. at p. 1004, 39 L.Ed.2d at pp. 212–213:

In other words, the Grounds case simply held that payment for natural gas at rates established or permitted by the Commission under the authority of the Natural Gas Act will not be regarded as payment for the helium constituent and cannot be asserted as a defense to a suit for the recovery of the value of that helium. In short, the federal statutory provisions do not under Grounds create a federal right of recovery, but only preclude the interposition of a plea of payment to defeat a quasi-contractual suit for the value of the helium.

In view of the fact that jurisdiction in this instance depends upon the interpleaded fund, and in view of the Mandate from the Court of Appeals, the Court overruled the motions for summary judgment. [Dkt. 1687.]

Considerable difficulty was had by court and counsel in interpreting the opinion of the appellate court, and in determining what issues remained for trial in this district court. Despite numerous conferences, counsel was unable to agree upon a pre-trial order, and on January 9, 1974, one was prepared and filed by the court. [Dkt. 1612.]

It was determined that the mandate from the Court of Appeals consisted of a judgment entered by that Court on March 2, 1971, the opinion of that court filed March 2, 1971, reported at 441 F.2d 704, and an order filed March 16, 1974 by that Court relating to costs.

In the order relating to costs on appeal, the Court ordered:

\*　　\*　　\*　　\*　　\*　　\*

---

subsequent helium extraction at Northern's Bushton plant, as the result of a gas exchange agreement between El Paso and Northern.

The gas delivered by Northern to El Paso in exchange for Atlantic Richfield gas was taken from a portion of Northern's pipeline system which does not serve as a source for the helium plant.

4. 481 F.2d 70, at pp. 72, 73, in referring to the remand of this case, the Court stated:

"We thought that we made plain that we did not allow recovery on the application of any principles of equity . . . but on the ground that satisfactory utility regulation does not permit a utility rate to be used to obtain a commodity which is not within the contemplation of that rate."

2. The interpleaded fund is the reasonable value at time of sale of the helium content of the natural gas which the Helex group has received from the lessee-producers and which has been processed in the plants of the Helex group for the separation of helium from natural gas. We leave to the trial court the determination of the time of sale, the points of delivery, and the method of measurement. Such determination shall be subject to review by this Court.

\* \* \* \* \* \*

14. This Order covers only costs in the Court of Appeals. District Court costs shall be determined by the District Court, subject to review by this Court.

15. The right of the lessee-producers to interest, and the amount thereof, on any sums which the District Court may adjudge to be due and owing to them shall be determined by the District Court, subject to review by this Court.

In the pre-trial order prepared by the Court [Dkt. 1612] it was determined that the issues of fact and law to be determined at trial on remand were:

a) A determination of the "reasonable value" at time of sale of the helium content of the natural gas processed at the Helex plants;

b) Whether or not the helex companies were accountable in these actions for helium extracted and stored, or extracted and sold privately, or extracted and delivered to the United States, but not paid for, or extracted and vented because of the refusal of the United States to accept further deliveries;

c) The proper basis for allocating payments for helium among the lessee-producer class;

d) The question of whether or not lessee-producers were entitled to interest on any sums awarded for the value of helium, and if so, at what rate, and from what date;

e) A determination of the proper basis for computing royalties which would accrue to the benefit of landowners.

In settling the pre-trial order, the court permitted the parties to attach as appendices to the order, statements concerning various other contended issues which each group believed to be of importance to this Court's action on remand. These appear as Appendix A through E in the pre-trial order.

C. *The Helium Extraction Process.*

Plaintiffs in these interpleader actions are: Northern Natural Gas Company, an interstate pipeline company, and its two wholly-owned subsidiaries, Northern Helex Corporation, and Northern Natural Gas Products Company;

Cities Service Gas Company, Cities Service Cryogenics, Inc., and Cities Service Helex, Inc. The latter two entities are wholly owned subsidiaries of Cities Service Company, which owns approximately 79% of the stock of Cities Service Gas Company; and

National Helium Corporation, which joined Panhandle Eastern Pipe Line Company as party defendant in Case No. KC–1980. Panhandle owns 50% of the stock of National Helium, and the remaining 50% is owned by National Chemical and Distillers Company.

The three helium extracting plants involved in these interpleader actions are the "Jayhawk Plant," operated by Cities Service Helex, Inc., at Ulysses, Kansas, which began extraction processes in June, 1963; the "Bushton Plant," operated by Northern Helex Co., at Bushton, Kansas, beginning December, 1962, and the "Liberal Plant," operated by National Helium Corporation, at Liberal, Kansas, beginning July, 1963. (U.S. Exh. 1). None of these plants are presently selling conservation helium to the Bureau of Mines due to cancellation of contracts by the United States. The United States—Helex Company contracts appear as L.P. Exhibits 2–3, 2–4, and 2–5.

Since the 1960 Helium Act Amendments, three private extracting plants

have supplied significant quantities of helium to commercial markets. (U.S. Ex. 2). These are:

a) The "Otis Plant," owned by George A. Angle, d/b/a Kansas Refined Helium Company, at Otis, Kansas, which began operations in April, 1966;

b) The "Greenwood Plant," owned by Alamo Chemical Company, a subsidiary of Phillips Petroleum Company and Gardner Cryogenics, at Elkhart, Kansas, which began operations in December 1966; and

c) The "Sunflower Plant," owned by Cities Service Cryogenics, Inc., a subsidiary of Cities Service Gas Company, and Helium, Inc., a subsidiary of Kansas-Nebraska Pipeline Company. This plant is located at Scott City, Kansas, and began operations in October, 1968.

The United States has no connection with any of these three private plants, and none are involved with sales of conservation helium, which is the subject matter of these actions. [Tr.2d 19:2191]

Prior to discussing the scope of evidence regarding *"reasonable value"* introduced at the second trial, it would be beneficial to briefly review the process of extracting helium and to set in context certain definitions of the various states of helium as it progresses through the extraction process.[5]

Helium occurs in nature as a constituent of natural gas, and natural gas which contains a significant percentage of helium is referred to as "helium bearing natural gas." The molecules of helium which are contained in this gas, are "pure" for helium is inert and will not combine chemically with any other element.

Since the helium in the gas is commingled with other constituents, it is referred to in testimony, and in these findings as "commingled helium." Commingled helium is what is produced from the natural gas wells and delivered by the Lessee-Producers to the pipeline companies. The helium transported by the pipeline companies to the helex plants is contained in the natural gas stream, and, as delivered to the helex companies, it is "commingled helium."

Some helium bearing natural gas which is delivered to the pipeline companies is not processed through helium extracting plants, and thus, some commingled helium is transmitted to fuel gas consumers without the helium first being extracted, and consequently, some commingled helium is wasted through vents from stoves and furnaces.

When helium bearing natural gas is delivered by the pipeline companies to a helex extracting plant, the commingled helium in that gas stream is extracted by a process which depends upon the fact that one property of helium is that it does not liquefy until it approaches a temperature nearing absolute zero, or $-453°F$. Although procedures differ slightly in the three helex plants, the general extracting process consists of drying and cooling the raw gas stream to successively lower temperatures in various stages by means of compressors, dehydrators, heat exchange plates, separators, "cold boxes," and other equipment, during which various hydrocarbons liquefy and drop out of the gas stream, leaving an "end product" which is sold to the United States as "crude helium." Thus, at the Northern helex plant, the whole gas stream is first cooled to about $-30°F$, at which point about 20% of the propane, 50% of the butane, 85% of the pentanes and 100% of the hexanes and heavier hydrocarbons elements are liquefied and removed. As temperatures are lowered further, all of the liquid hydrocarbons are "swept out" of the gas stream, until at $-275°$ all liquids are extracted leaving a mixture of helium and other gases, mainly nitrogen, with a helium content of 60%–85%, generally around 70%.[6] This mixture is

5. PEPLX 120 is a diagram illustrating terminology applied to helium in various stages from well to markets. See also Wheeler 15:-1534–1536.

6. Conservation contracts required that the contained helium in the crude mixture was to be not less than 60%. LPX 2–3.

the commodity known as "crude helium" which is sold to the United States by the helex companies, and delivered into government pipeline systems for storage at the Cliffside Field in Texas. The Bureau of Mines pays the helex companies only for the contained helium within this "crude helium" mixture. Thus, the $12.00 mcf price, which is used as a general reference figure of sums received from the Bureau of Mines by the helex companies, is applicable only to the 60%–85% portion of contained helium within the crude helium mixture delivered by the helex companies.

Helium can not be extracted from the natural gas stream unless liquid hydrocarbons are first extracted and removed. This is because it is absolutely necessary to remove all moisture content in the gas stream before proceeding to the very low temperatures necessary to extract helium. If these liquids are not removed, they will spray out, solidify and frost deposits will accumulate on heat exchange surfaces, making the helium extraction processes inoperative.

All three of the helex plants involved in this litigation extract and sell liquid hydrocarbons in the process of extracting helium, and revenues and profits from sales of these liquid hydrocarbons inure to the benefit of the helex companies or their affiliates. While it is necessary to remove these liquid hydrocarbons temporarily, they may be reintroduced into the gas stream after the helium is extracted. In helium extracting plants operated by the Bureau of Mines, the liquid hydrocarbons are not permanently removed and sold. They are, instead, returned to the natural gas stream after the helium constituent has been removed.

Crude helium is also extracted in a few private plants, and in plants operated by the Bureau of Mines. These plants, however, go one step further in the extracting process, removing the nitrogen content of the crude helium mixture in order to produce an essentially pure helium product which is referred to as "Grade A helium," which is then distributed and sold to the ultimate consumer. "Grade A" helium has 99.995% to 99.997% helium content.[7] During earlier years, most consumer sales of Grade A helium were in gaseous form. In recent years, Grade A helium is more commonly sold in liquid form. Liquid helium is obtained by further cooling of Grade A helium to temperatures of −453°, 7 degrees above absolute zero, at which point it liquefies. Additional costs are incurred in the process of liquefying, storing, and transporting liquid helium.[8]

Immediately prior to the 1960 Helium Act Amendments, the Bureau of Mines was selling Grade A helium for "commercial markets" at $19.00 Mcf, and at $15.50 Mcf to governmental agencies. Since the conservation program, Grade A helium has been offered for sale by the government at $35.00 Mcf (the price designed to recover costs of the conservation program), while sales by private plants have ranged from the $35 government price down to $19.00 Mcf by the Kerr McGee plant in Arizona. [LPX 2–25; USX 70.] In 1967 there were some offers to sell Grade A helium for $15.00 per Mcf. [Garwin 3:288–290; Garwin Depo. USX 62, p. 13.]

The sale price of Grade A helium in liquid form has ranged from $22 to $23 per Mcf of equivalent gas. [Tr. 1837].

Expert opinions are that due to scarcity of the commodity, the price of Grade A helium will rise to $75 to $100 per Mcf by 1985, with prices thereafter ris-

---

7. Helex X 323 illustrates how helium occurs and what it is called at various trade levels. See also Wheeler T 2d—15:1533, et seq.

8. During years 1961–1965 all Grade A helium was sold in gaseous form. In 1966, private plant operators began to sell in liquid form, and by 1974, approximately 80% of all helium sales were in liquid form. [Tr. 301, Tr. 1835, et seq.]

Witness Harlan testified costs of liquefying helium total $5.53 Mcf [Tr. 1840]; Witness Garwin set costs of liquification at $2.00 to $5.00. [Tr. 238–239.]

ing astronomically due to depletion of the resource. [Garwin 1:82.]

D. *Operations at Cities, Northern and National Helex Plants.*

1. *Northern Helex, Bushton, Kansas.*

The Bushton plant has three separate facilities: a liquid hydrocarbon extraction plant, completed in 1961; a helium extraction plant, completed in December, 1962; and an ethane extraction plant, which was completed in 1970. Both the liquids extraction plant and the ethane plant are operated by Northern Gas Products Company. The pipeline company, Northern Natural Gas Company owns Northern Gas Products Company. Northern Gas Products Company in turn owns Northern Helex Company.[9] [Wobker 13:1392.]

Two gas streams are processed in this plant: one, containing "rich gas", comes from 1,950 wells located over 38,000 square miles in Southwest Kansas and small parts of Oklahoma. The other, furnishing "lean gas" contains gas from areas other than the Hugoton area. [Wobker 12:1319.] Only the "rich" gas stream in this plant is processed for helium, but both streams are processed for the extraction of liquid hydrocarbons.[10]

2. *Cities Service Helex Company, Jayhawk Plant, Ulysses, Kansas.*

All gas which is fed into this plant is processed for extraction of both liquid hydrocarbons and helium. Any gas which is bypassed around the plant does not get processed for either. [LPX 2–9.] The inlet gas composition at this plant did not vary in any material respect. During years 1964–1972, the helium content of the natural gas stream remained at .42% to .43%. [LPX 2–10; Cities X2.]

Some gas is bypassed around the plant and never processed for the extraction of helium. This is because the capacity of the Jayhawk plant is about 500 million cubic feet per day, and gas available from the pipeline may exceed 625 million cubic feet per day.

Approximately 75% of the gas feeding into the Cities plant has already been processed once for hydrocarbon content in conventional natural gasoline extraction plants. [Whiteaker 3:311.] Liquid hydrocarbons are recovered in this plant, LPX 2–10, 211 reflecting yields of liquids from the Cities Helex plant.[11]

9. Northern Gas Products Company operates the liquid hydrocarbon plant at Bushton, per contract dated 10/28/60 with Northern Natural Gas. The liquids plant had already been built prior to execution of the helium conservation contract with the government, and liquid extraction was awaiting F.P.C. certification to "shrink" gas.

10. For general description of Northern operations, see Garwin 1:105; Whiteaker 3:310; Wobker 12:1314 et seq.

LPX 2–7, 2–8; NOX 22, 23, 26, 27, 28 are diagrams and flow sheets illustrating operations at Northern Helex. NOX 30, 31 illustrates projected and actual production figures at Bushton plant.

The Northern Natural Gas pipeline system is illustrated in maps appearing as NOX 21, 20 and plant investment, in NOX 16, 17. According to books and records of Northern Helex, the average rate of return during 1962–1973 was 6.7% after taxes [NOX 18]; and the net profit, after taxes, per Mcf of helium sold to the United States, ranged from approximately 68 cents per Mcf in 1963, to $2.-

61 Mcf in 1970. [See NOX 75; Sulentic 14:1446.]

11. Cities X 13 is a map illustrating pipeline system of Cities Service Gas Company. Exhibit 14 lists book investment in system; Exhibit 15 lists all gas purchase contracts covering gas "which may have been processed" through Cities Helex Plant; Exhibit 20 is all major gas purchase contracts of Cities; Exhibit 16, schedule of Cities' gas exchange contracts; Exhibit 17 contains figures of net inputs into the Hugoton system, listing totals of exchange gas, gas delivered and sold, diverted gas.

For general description of operations at Cities Helex Plant, see Garwin 1:111, Harlan 17:1849 et seq., and see Cities Exhibits 1, 3, 4, 7 and 12 for volumes of gas processed at Cities; Exhibits 5, 6, 8, 10, flow diagrams, lists of equipment at the plant and testimony of Harlan 17:1791, et seq.

It should be noted that Cities Service Cryogenics, Inc., another subsidiary of Cities Service Gas Company, operates a separate helium extraction plant at Scott City, Kansas, as a

3. *National Helium Plant, Liberal, Kansas.*

Two different gas streams serve this plant: one, the "Kansas Gas Stream" has a .45% helium content. The other, the "Texas Gas Stream" has a helium content of .40%. Either of these two streams can be bypassed around the extraction plant, but once fed into the plant, they are combined, and treated as one. After the two streams are commingled, they are processed for extraction of both liquid hydrocarbons and helium. [LPX 2–12, 2–13.] In the National plant, after processing, the gas is reconstituted in order that it may leave the helex plant in two separate streams in essentially the same condition as at the inlet points.

Prior to construction of the National Helex plant, there was a hydrocarbon extraction plant at Liberal, operated by Century Refining Company, a subsidiary of Panhandle Eastern Pipe Line Company. This extraction plant processed essentially the same gas streams which presently serve the helium extraction plant. National has agreed to deliver for Century's account, certain amounts of liquid hydrocarbons comparable to those extracted previously by Century. See Garwin 1:116 et seq; Garwin 1:184; Whiteaker 3:310. Approximately 27% of the gas which is processed in the National Plant comes from wells which are owned by Panhandle Eastern Pipe Line Company.[12]

By stipulation, all of the gas which has been processed in the three helex extracting plants just described is "jurisdictional gas." Jurisdictional natural gas is "gas which is being transported in interstate commerce for resale subject to rate schedules imposed by the Federal Power Commission." [Garwin 1:140–141.]

E. *Crude Helium Market.*

The United States conservation program created a market for crude helium which did not before exist. Between 1961 and March, 1971, the government purchased over 30 billion cubic feet of contained helium in a crude helium mixture for prices ranging from about $10

---

joint venture with Kansas Nebraska Pipeline. This is referred to as the "Sunflower Plant" and this operation was not connected with the government conservation contracts. Cities Service Cryogenics operated a purifying and liquefying plant on the site of the Jayhawk Plant at Ulysses, but this was a separate operation from that conducted by Cities Service Helex. [See Harlan 17:1827, et seq.] According to books and records of Cities Helex, rate of return on average net investment, 7/1/63 to 12/31/71 was 12.916% [Cities X 11R], or on a cash flow basis, 8% [Cities X 21.].

Again, according to Cities Helex books and records, return on average net investment, per Mcf of helium sold to the United States ranged from a loss of 37 cents per Mcf in 1963, to a high of $3.79 in 1967, and down to 3.51 per Mcf by 1971. [Cities X 29.] For discussion of rates of return in Cities Helex operations, see Larson 17:1910 et seq.]

12. A general description of the National Helex facility appears in testimony of Garwin, 1:116, et seq., and LPX 2–12, 2–13.

Maps of the Panhandle Eastern Pipeline System, illustrating its three gathering systems, the Texas system, 140 miles, the Kansas system, 110 miles, and the Huber-Light system, through the Oklahoma Panhandle, 60 miles, appear as PEX 62, parts 1 and 2, and PEX 104, parts 1 and 2.

According to the books and records of National Helium Corporation, its average rate of return on it "average net investment," after taxes, on its helium operations alone was 15.35%. [PEX 96]

Its rate of return on total operations, including liquid hydrocarbon sales, for 1964, was 13.08%. [PEX 97]

According to National's books, the average cost of extracting helium, 1963–1971, was $6.94 per Mcf. [PEX 113]

Again, according to National's books, net revenues derived from sales of crude helium to the United States, before, and after income taxes, are the following: [PEX 114]

| | Before Taxes | After Taxes |
|------|-------------|-------------|
| 1963 | $4.69 per Mcf | $2.21 per Mcf |
| 1964 | 4.71 | 2.31 |
| 1965 | 5.32 | 2.70 |
| 1966 | 5.50 | 2.79 |
| 1967 | 5.41 | 2.75 |
| 1968 | 5.54 | 2.56 |
| 1969 | 5.74 | 2.65 |
| 1970 | 5.74 | 2.81 |
| 1971 | 6.13 | 3.07 |

Mcf to $13 Mcf.[13] The contracts under which these purchases were made were negotiated in 1961, after notice of the program was given to about 370 parties. 292 F.Supp. at 655, 656.

Starting in 1966 several private plants began operations in the Hugoton area, making sales to parties other than the government.[14] Witness Harlan testified that the scope of these sales approximated 20% of the crude helium extracted since 1966 by private, non-conservation plants, and that the sales price had been in the range of $12 to $14 Mcf of contained helium. [Tr. 17:1827–1834.]

About ½ of the contained helium which moved to the fuel markets as part of the gas stream from the Hugoton gas area in the 1960's was not processed through any helium extraction plant. [USX 16.]

By 1966, the helex conservation plants were producing more crude helium than they could sell to the Bureau of Mines. The United States agreed to store this excess production in the Cliffside storage reservoir, and stored and returned the following amounts of contained helium during the years indicated: [USX 11, 12].

| National Helium Corporation | Cities Service Helex | Phillips Petroleum Company | Northern Helex Company |
|---|---|---|---|
| 1966–1973 Mcf | 1967–1973 Mcf | 1968–1973 Mcf | 1971–1972 Mcf |
| In: 302,519 | In: 205,061 | In: 78,440 | In: 877,150 |
| Out: 251,355 | Out: 128,039 | Out: 21,389 | Out: 44,788 |

Northern has disposed of some surplus crude helium by sale to Kansas Refined Helium at a price of $9.50 Mcf of contained helium in the crude helium mixture. [USX 28, 29; Tr. 2:226–227.] National Helium has sold some surplus to Kansas Refined Helium at a price of 34 cents more than prices paid by the United States. [Tr. 19:2156–2159.] National has also sold about 50 million cubic feet of helium in crude helium to Airco Company at a price of $12.45 Mcf, approximately the price being paid by the United States. [Tr. 19:2158, 2159.]

National Helium still has 51 million cubic feet of contained helium in storage at Cliffside and has been unable to dispose of this or of the helium it has extracted since the United States terminated the helium purchase contract it had with National Helium. [Wilson 19:2155–2160.]

13. The United States has paid three of the Helex companies for crude helium delivered to July, 1972. Northern has been paid for deliveries through March 28, 1971. Other litigation is pending concerning the government's termination of the Helex conservation program.

14. USX 1 shows location of Bureau of Mines and Conservation plants, 1973, with dates of initial production; USX 2 shows location of private industry helium plants, and dates of initial production. These private plants are:
Sunflower Plant—owned by Cities Service Cryogenics;
Otis Plant—owned by Kansas Refined Helium Company;
Greenwood Plant—owned by Alamo Chemical Co. and Gardner Cryogenics;

Pinta Dome Plant—operated by Kerr-McGee Oil Industries;
"Navajo Plant"—operated by Western Helium Corporation
USX 3 shows location and dates of both government and private helium extracting plants which have closed down during years 1968–1973.
USX 4 summarizes helium conservation contracts.
USX 5 lists all helium extracting plants which have operated in the United States from 1929 to date, with data concerning plant capacity and helium content of gas processed in each plant.
The three helium plants involved in this action have the largest capacity, but process gas with least helium content, approximately 4/10ths of one per cent (1%).

Northern has tried to sell the helium which it has extracted since the government stopped buying from its Bushton plant, but it has been unsuccessful, [Tr. 2:219–226; 12:1273, NOX 34.] and Northern has been venting helium to the air.

At the end of 1973, the United States had 36,529,439 Mcf of conserved helium in underground storage at Cliffside. [USX 10.] None of the crude helium delivered to the United States in connection with the conservation sales contracts has been removed from storage at the Cliffside reservoir. [USX 14, 15, Tr. 2:189, 20:2335, 2336.] None of the conservation helium has been sold to anyone. If and when it is removed from storage at Cliffside, it would have to be purified to get it in a stage comparable to the crude helium state in which it was initially delivered by the Helex plants. This is because it has become mixed with other natural gas native to Cliffside Field. [Tr. 19:2195–97.] If the United States wanted to sell this stored helium today which it has no plans to do, the chance of selling it at a reasonable price in today's market would not be very good. [Tr. 20:2337–2339.]

One practical example of the dilemma faced by the United States in implementing its helium conservation program is illustrated by the fact that if the government buys crude helium for $12.00 per Mcf, and must borrow the money to do so, and then is required to store it for 30 years before it is needed for the consumer market, it would have to sell one Mcf of helium for $300 simply to recover the interest compounded on its initial $12 "investment." See USX 63, charts on committee hearings, 1969. [USX 14, and Dunn 8:873–876.]

USX 13, 14 and 15 graphically illustrate the fact that helium recovery capacity vastly exceeds the demand and consumer market, and that with cancellation of the conservation contracts by the United States, the principal buyer for crude helium has vanished, and the market value of crude helium today, for all practical purposes, is "zero."

F. *Termination of Conservation Contracts.*

In January, 1971, the United States decided to terminate its contracts with the Helex companies, effective March, 1971, due to diminution of demand for helium for government activities, discoveries of new helium reserves, and availability of helium from natural gases of low helium content. [PEX 71; USX 71, 72, 17 and 18.]

The Federal Helium Conservation Program did not produce the income anticipated by its planners for two principal reasons: government sales of helium at the $35 price were substantially less than expected; and a greater volume of helium was extracted by conservation extractors and by private extractors than had been anticipated. It was found that if conservation contracts were continued, about 69 billion cubic feet of helium would be stockpiled, instead of 43 billion cubic feet anticipated, and that rather than being self-liquidating, as required by the Helium Act, the program would owe the Treasury about $1.5 billion for borrowings and interest. [Lipper Tr. 20:2301–07; USX 63, USX 67–69.]

In connection with the alleged failure of the United States to pay for helium deliveries, Northern in 1970 declared its contract breached, but during the following 18 months, it continued to produce crude helium which it stored at Cliffside, under a storage agreement with the Bureau of Mines. [Wobker 13:1363.]

Since September 28, 1972, Northern has been venting the crude helium gas mixture into the air. There is no market for the stored helium, and it is not economically feasible for a business to produce helium for storage. [Wobker 13:1364–65; Nicholson 12:1272–73.]

The termination of contracts with National, Cities and Phillips pursuant to the January 26, 1971 termination notices, to be effective March 28, 1971 [PEX 71] was enjoined by federal court on grounds the Secretary of Interior had not complied with National Environmen-

tal Policy Act. National Helium v. Morton (10th Cir.), 455 F.2d 650, D.C., 326 F.Supp. 151.

By letters dated February 2, 1973, the Secretary of Interior issued new notices of termination of the contracts to National Helium, Cities Service Helex, and Phillips Petroleum Company, effective April 4, 1973. [PEX 72.] This termination was approved by the Court of Appeals. National Helium Corporation v. Morton (10th Cir., 1973), 486 F.2d 995, cert. den. 416 U.S. 993, 94 S.Ct. 2405, 401 L.Ed.2d 772. The valve through which crude helium was delivered by National Helium Corporation to the Bureau of Mines was turned off on November 12, 1973. [Wilson Tr. 19:2154–55.]

On December 24, 1970, Northern Helex filed suit against the United States seeking damages for breach of the conservation contract. On January 21, 1972, the Court of Claims granted Northern Helex summary judgment, holding that the United States had materially breached the contract, by failing to pay for crude helium delivered by Northern and leaving for further determination the amount of recovery. [NOX 36A, 36B, 36C.] Northern Helex Company v. United States (1972), 455 F.2d 546, 197 Ct.Cl. 118.

The Court of Claims found that from November 1969 through November, 1970, the government paid nothing at all for helium delivered by Northern. On January 14, 1971, after suit in the Court of Claims was filed, the United States sent Northern Helex a check for $8,671,-631.99, the total amount then due for all helium delivered by Northern. On January 26, 1971, the contract was terminated, effective March 28, 1971.

Northern refuses to recognize the legitimacy of termination and has billed the United States for helium delivered through March 31, 1971. On June 23, 1971, Northern received a check for $2,285,872.87 for deliveries December 1970 through March 28, 1971.

Northern takes the position that these two payments are in mitigation of damages and not payments for deliveries of crude helium.

For some period of time, the United States accepted deliveries of crude helium from Northern Helex, under interim agreements for storage at Cliffside, but when negotiations for a long term storage agreement broke off, the government ceased accepting deliveries on September 28, 1972, and Northern commenced venting helium into the atmosphere. [NOX 36D, 36E, 36F; Wobker, 13:1363–1365; Nicholson 12:1272.]

The Court finds that Northern made deliveries of crude helium through the first 27 days of March, 1971, and that deliveries thereafter were stored for Northern's account.

The Court further finds that, for the purpose of Case No. KC–1969, the two payments made by the United States of $8,671,631.99 on January 14, 1971, and of $2,285,872.87 on June 23, 1971 constituted payment for deliveries of crude helium by Northern through March 28, 1971, and that such sums constitute a portion of the Fund which is the subject matter of Case No. KC–1969.

G. *The Gas Purchase Contracts.*

Considerable attention was given to the gas purchase contracts existing between the pipeline companies and the lessee-producers in this Court's prior opinion, 292 F.Supp. at 669 et seq. The contracts in question number approximately 320 in the case of Northern Natural Gas Company, 532, in the case of Panhandle Eastern Pipe Line Company, and approximately 100 in the case of Cities Service Gas Company.

These contracts provide that the lessee-producers warrant title to all gas "sold," "delivered," or "sold and delivered," and they indemnify the pipeline purchaser against losses arising out of adverse claims with respect to the gas conveyed. The contracts further provide that in the event of adverse claim to the gas, the pipeline purchaser may retain the purchase price, up to the amount of

such adverse claim, without interest, until such adverse claim has been determined.

Under most of the contracts the producer sells the gas to the pipeline at the wellhead. As the gas is produced, it passes through wellhead meters and is delivered to the pipeline.

In some instances, the producer sells the gas to the pipeline off the leased premises, after gathering to a central point, or after processing through a gasoline plant. In these cases, the volume of gas delivered to the pipeline is measured at such central point, or at the "tail gate" of the gasoline plant.

Each of the gas purchase and sales contracts states a unit price per Mcf in money, and lessee-producers are paid on the basis of volume of the entire metered stream of gas at the delivery point, without regard to the individual components of such gas.

The contracts commonly include provisions for periodic step escalations in the price to be paid, frequently stated in terms of cents per Mcf of gas delivered during five year intervals. Some contracts provide for re-negotiation, at stated periods, and if the parties fail to agree on a new price, provisions are made for arbitration.

The producers' sales of gas to the pipelines are sales in interstate commerce of natural gas for resale. The contracts under which such sales are made are filed with the Federal Power Commission under the Natural Gas Act, as amended, 15 U.S.C. § 717 et seq. The pipelines' payments for gas under such contracts are made at rates established or permitted to be paid by the Commission, expressed in cents per Mcf applied to the delivered volumes of gas.

The price paid by the pipeline companies for purchased gas was the FPC ceiling price, or the price recited in the gas purchase contract, whichever was lower, and the price paid was applied to the volume of the entire gas stream.

During the period here in question, the prices paid by each of the three pipeline companies involved in these interpleader actions, exclusive of prices paid for new supplies after 1970, ranged from a low of approximately 11.5 cents per Mcf to a high of approximately 18.5 cents.

From 1962 to 1972, Northern Natural Gas Company bought gas at the following average prices: [NOX 39.]

| | Kansas | Oklahoma |
|------|--------|----------|
| 1962 | 13.14¢ per Mcf | 16.85¢ per Mcf |
| 1963 | 13.02¢ | 15.97¢ |
| 1964 | 11.45¢ | 15.81¢ |
| 1965 | 11.65¢ | 16.20¢ |
| 1966 | 11.69¢ | 16.74¢ |
| 1967 | 12.16¢ | 17.35¢ |
| 1968 | 12.85¢ | 17.24¢ |
| 1969 | 13.11¢ | 17.19¢ |
| 1970 | 13.17¢ | 17.61¢ |
| 1971 | 14.75¢ | 17.75¢ |
| 1972 | 15.20¢ | 18.56¢ |

From 1962 to 1972, Northern's predominant unit costs for new contracts for gas purchases were the following: [NOX 40.]

| | Kansas | Oklahoma |
|------|--------|----------|
| 1962 | 16.0¢ per Mcf | 17.0¢ per Mcf |
| 1963 | 16.0¢ | 17.0¢ |
| 1964 | 16.0¢ | 17.0¢ |
| 1965 | 16.0¢ | 17.0¢ |
| 1966 | 16.0¢ | 17.0¢ |
| 1967 | 16.0¢ | 17.0¢ |
| 1968 | 16.0¢ | 17.0¢ |
| 1969 | 16.0¢ | 17.0¢ |
| 1970 | 19.0¢ | 17.0¢–20.0¢–23.5¢ |
| 1971 | 19.0¢—24.0¢ | 20.0¢—23.5¢ |
| 1972 | 26.5¢—36.0¢ | 20.0¢–32.0¢–44.0¢ |

The Northern gas purchase contracts are in evidence as NOX 1–15, and summaries of contracts covering 85% of gas purchased by Northern appear as NOX 41–58 and 61–74. Some of Northern's contracts, as to certain time periods, provide for a price in excess of the ceiling area rate established by the FPC (e. g., NOX 41); some provide for a price equal to such ceiling area rate (e. g., NOX 42); and some provide for a price lower than the area rate (e. g., NOX 63). [Kratky 14:1514–1515.]

From 1961 to 1971, Cities Service Gas Company bought gas at the following average prices for wellhead delivery: [Morton 15:1576–1577; Hofsess 17; 1763–1764; Cities X 25.]

| | Kansas | Oklahoma | Average |
|------|------------------|----------------|------------------|
| 1961 | 12.16¢ per Mcf | 11.50¢ per Mcf | 11.68¢ per Mcf |
| 1962 | 11.57¢ | 12.14¢ | 11.69¢ |
| 1963 | 13.99¢ | 12.35¢ | 13.58¢ |
| 1964 | 14.07¢ | 12.19¢ | 13.58¢ |
| 1965 | 14.12¢ | 12.11¢ | 13.64¢ |
| 1966 | 12.91¢ | 12.49¢ | 12.81¢ |
| 1967 | 12.93¢ | 12.90¢ | 12.92¢ |
| 1968 | 12.92¢ | 13.39¢ | 13.04¢ |
| 1969 | 12.79¢ | 13.24¢ | 12.89¢ |
| 1970 | 12.81¢ | 14.22¢ | 13.11¢ |
| 1971 | 12.86¢ | 16.26¢ | 13.61¢ |

Comparable figures for Cities Service field line purchases, 1961–1971 in Kansas and Oklahoma, appear in Cities X 26. Cities Service Gas Company gas purchase contracts appear in evidence as Cities X 20, Parts 1–10. A schedule of contracts where the full contract price was paid is Cities X 19; and a schedule listing contracts where less than contract price was paid appears as Cities X 18.

From 1962 to 1972, Panhandle Eastern Pipe Line Company bought gas at the following average prices: [Morton 15:1575.]

| 1962 | 13.8¢ per Mcf |
|------|---------------|
| 1963 | 14.3¢ |
| 1964 | 14.3¢ |
| 1965 | 14.6¢ |
| 1966 | 15.1¢ |
| 1967 | 15.6¢ |
| 1968 | 15.6¢ |
| 1969 | 15.9¢ |
| 1970 | 17.2¢ |
| 1971 | 17.0¢ |
| 1972 | 18.6¢ |

The average prices for gas specified in *new* contracts made by Panhandle during 1962–1972 were as follows: [Morton 15:1576.]

| 1962 | 16.08¢ per Mcf |
|------|----------------|
| 1963 | 16.45¢ |
| 1964 | 15.97¢ |
| 1965 | 16.64¢ |
| 1966 | 16.67¢ |
| 1967 | 16.04¢ |
| 1968 | 17.05¢ |
| 1969 | 17.01¢ |
| 1970 | 19.83¢ |
| 1971 | 22.36¢ |
| 1972 | 31.10¢ |

A list of Panhandle gas supply contracts appears as PEX 1. The actual contracts, appearing as PEX 2, and numbering over 500, were withdrawn by leave of court. [Tr. 18:1975.]

Computer printouts PEX 3, give data on all gas delivered to Panhandle; PEX 4, gives data on gas purchases where full contract price was not paid; and PEX 5 are computer runs on gas purchase contracts where full contract price was paid.

Approximately one-third, or 27% of the gas stream supplying the National Helex plant via Panhandle Eastern Pipeline came from approximately 580 gas wells owned by Panhandle Eastern, and gas so produced was not subject to any gas purchase contract. For purposes of computing royalties payable to landowners, Panhandle set a value on this gas in the Kansas and Oklahoma Hugoton fields at 11¢ per Mcf from August 1, 1963 to November 1, 1971. These values were raised to 12.50 cents per Mcf in the Kansas Hugoton field, and to 13.25 cents per Mcf in the Oklahoma Hugoton field on November 1, 1971, after suit had been filed on behalf of various landowners.

On its own production in the West Panhandle of Texas, Panhandle Eastern paid royalties based on values of 12 cents per Mcf from 8/1/63 to 1/1/65; 13 cents from 1/1/65 to 11/1/71; and 13.50 cents from November 1, 1971 to January 1, 1972. [PEX 6; Dixon 19:2075, 2090; Wiedenheft 18:1988–2000.]

Another large portion of gas carried by the Panhandle pipeline system was acquired by Panhandle from producers and other pipeline companies under 22

gas *exchange* contracts involving the exchange of gas for gas [PEX 2, Contracts numbered 9001 through 9022; Dobbs 18:2028, 2035–2036, 2045–2047.] No money changed hands on these gas exchange contracts. No price per Mcf was attached to or placed on gas exchange between the parties, and these agreements appear to have been made for the convenience and mutual benefit of the parties. A typical exchange contract provides that: [PEX 2, Contract No. 9004, pp. 4, 5; 9008, ¶ 8.]

. . . possession of and title to all gas exchanged * * * shall pass to the receiving party at the point of delivery,

and arrangement under the contract

. . . shall be limited to the exchange of gas and shall not be considered or held to be a sale, and no price shall be placed on the gas received.

With respect to gas balancing, the exchange contracts typically stated that it was understood that the exchange of gas was for the mutual benefit of the parties and was made with no thought whatever of the profit or loss that would ordinarily attend a sale or purchase of gas and no price per Mcf was attached to any of the gas exchanged between parties. [Dobbs 18:2034–2036; PEX 2, Contract 9008, ¶ 8; PEX 2, Contracts 9001–9022.]

Many of the points of exchange are long distances from each other and many are for transportation convenience of the parties. Part of the exchanges cover gas from a particular well, or wells, and part is from pipelines. Sometimes wellhead gas is exchanged for pipeline gas. Dobbs 18:2029, 2045; PEX 34 summarizes gas exchange contracts, and PEX 35–56 consist of maps indicating points of delivery and re-delivery of gas under each specific exchange contract.

None of the 22 gas exchange contracts implemented by Panhandle contains any provision for adjustment of volumes in exchange by reason of the helium constituent, either in the gas delivered, or in the gas received. [Dobbs 18:2040, 2045–2047.]

H. *Processing Agreements Between Helex Companies, and Pipe Line Companies.*

The gas supply for the Northern Helex Plant at Bushton is obtained by contract with Northern Natural Gas Company; the gas supply for Cities Helex is obtained from Cities Service Gas Company; and the supply for the National Helium Plant at Liberal, is obtained by contract with Panhandle Eastern Pipe Line Company.

After the gas was delivered by Lessee-Producers to the pipelines at prices ranging from approximately 11.5 cents to 18.5 cents per Mcf, as discussed supra, it was then conveyed by the pipeline companies to the helium extraction plants for processing before continuing on to ultimate fuel consumers.[15] On its way to the Helex plants, some of the gas was sold "off the line" to consumers or other pipeline companies; some was consumed as fuel in the pipeline compressor stations, etc., and some of the gas was completely bypassed around the extracting plants.

The gas which was delivered to the Helex plants was subject to certain "processing agreements," whereby the Helex companies made various payments to the pipeline companies for the right to extract helium and hydrocarbons.

The National Helium-Panhandle Eastern Agreement, dated October 2, 1961 [LPX 2–79], covering a gas stream with .40% helium content, granted the right to extract helium, helium-gas mixtures, nitrogen, and certain liquid hydrocarbons, other than methane.[16] For

15. The Bushton helex plant is approximately 100 to 150 miles distant from the Hugoton area where Northern Natural Gas Company purchased gas. [Arnold 21:2506; Hanley 14:1483–92; NOX 19, 29]

Portions of Panhandle Eastern gas are transported more than 100 miles before reaching the National Helex plant at Liberal.

16. National was required to reinject hydrocarbons as necessary to maintain gas re-

this privilege, National paid Panhandle Eastern a base price of 35¢ per Mcf for "shrinkage," [17] plus a base price of $2.06 per Mcf for all volumes of contained helium extracted by National. The $2.06 base figure for helium was subject to escalation according to the wholesale price index, and this fee ranged from $2.05 in 1963 to $2.36 in 1971, and averaged $2.16.[18] [PEX 113, Schedule 1; Lawson 21:2429.]

The Cities Helex—Cities Service Gas Company Agreement, dated August 18, 1961, contemplates delivery of a gas stream of .47% helium. [LPX 2–64, 2–65] The Cities Service arrangements provide for a processing fee of 1.35 cents for each Mcf of natural gas delivered to the Helex plant, subject to adjustment for helium content of the gas stream above and below .47% helium content. [LPX 2–65, "Processing contract," ¶ 5(a)] The figure of 1.35 cents per Mcf, as applied to the whole gas stream, is equivalent to $3.00 per Mcf for contained helium which is extracted from that stream. [Garwin 3:298]

The Northern Helex—Northern Natural Gas Agreement, dated July 28, 1961 [LPX 2–61], contemplates delivery of gas containing .46% helium, and provided for payment of 28 cents per Mcf for volumes of helium gas extracted.[19] Northern Helex also agreed to pay to Northern Natural Gas, all payments which the pipeline company might be required to pay to third parties for their interest in the helium extracted.

The extraction of liquid hydrocarbons, which was a separate operation run by an affiliated company, Northern Gas Products Company, was the subject of separate contracts. A 20-year liquid hydrocarbon extraction agreement between Northern Natural Gas and Northern Gas Products [NOX 24, as amended NOX 24B, 24A] provided a right to extract liquid hydrocarbons for payment by Northern Gas Products of 46 cents per Mcf for "shrinkage," with Northern Products obliged to redeliver gas equivalent in heating value to 975 BTU. By amendment of June 26, 1967 [NOX 24B] the right to extract ethane was added, for a payment of 26 cents per Mcf for volumes of gas used in extraction of ethane alone. Actual payments for these liquid extractions were made under a formula provided by contract. [NOX 24A][20]

I. *Contentions of the Parties—"Reasonable Value".*

The Court permitted the parties to explore the question of "reasonable value" in terms of its widest scope and ramifications. As a result of this, the Court has before it evidence that the "reasonable value" of commingled helium in the natural gas stream ranges from a "negative value" of several dollars [PEX 118]; that its value is "zero"; that its value is the agreed volumetric prices set out in gas purchase contracts, as regulated or not regulated by the FPC, in any event, not more than 15 to 20 cents per Mcf of helium; and that its "reasonable value," according to evidence offered by lessee-producers and landowners, ranges from $2.74 to $15.79 per Mcf of helium extracted at the Cities Helex

---

delivered to Panhandle at fuel content of 975 BTU.

17. Shrinkage included fuel consumed within the plant, and loss attributable to helium extraction. Shrinkage at the National plant was attributable 75% to hydrocarbon extraction; 20% to helium extraction; and 5% to nitrogen extraction. [Whiteaker 4:403-404]

18. On October 31, 1963, Panhandle agreed to reimburse National for payments made under the provisions for $2.06 per Mcf for helium extraction in the event this Court determines

a part of this sum is due and owing to third parties. [LPX 2–91; Whiteaker 4:424; 4:438]

19. The written contract provides for payment of 28 cents per Mcf. [LPX 2–61, Article V, § 5.1] One witness testified the payment was 23 cents per Mcf. [Nicholson 12:1301]

20. Northern Natural Gas Company was required to add approximately $4,810,100 in additional pipelines and compressor equipment in order to provide additional gas for ethane extraction. [NOX 25]

plant; from $7.77 to $12.64 per Mcf for helium extracted at the Northern Helex plant; and from $12.74 to $16.20 per Mcf for extracted helium at the National Helium plant.

This rather surprising gulf between the parties' notions of "reasonable value" stems of course from further exhaustive evidence organized and offered by all opposing sides, in support of their respective versions of "the refreshing authority found in the folk-tale of the Little Red Hen," thoughtfully noted by the Court of Appeals, 441 F.2d 704, at 721.

In the search for "reasonable value" this Court has received evidence touching upon the value of helium in its various states, as it appears in "helium bearing natural gas," "contained helium," "crude helium" and "Grade A helium." Helex Ex. 316, 328 graphically illustrates the fact that it is most necessary to carefully consider the "market place" in which one references "value." These "market places" include:

1. The sale of helium bearing natural gas by the lessee producers to the pipeline companies: As noted, these sales ranged from approximately 11.5 cents to 18.5 cents per Mcf. The Court of Appeals has ruled that these payments did not include payment for the helium constituent.

2. The sale of helium bearing natural gas by the pipeline companies to ultimate fuel consumers. In such instance, the contained helium has no value because it is vented into the atmosphere.

3. The "sale" of contained helium by the pipeline companies to helium extracting plants through "processing agreements," wherein payment is made for "shrinkage," and/or a fee is charged based upon volumes of contained helium extracted, such fees generally ranging from $2.00 to $3.00;

4. The "sale" of liquid hydrocarbons which may be extracted as a "by product" or "joint product" of the helium extracting processes;

5. The sale of crude helium to the United States Government by the Helex companies, under the conservation contracts at the approximate price of $12.00 per Mcf for contained helium;

6. The sale of crude helium to private helium plants producing Grade A helium, at prices of approximately $12.00 to $9.50 per Mcf for contained helium;

7. The sale of Grade A helium by Bureau of Mines plants at a price of $35.00 per Mcf;

8. The sale of Grade A helium by private plants at prices ranging from $19.00 to $35.00 per Mcf; and

9. Future sales of helium stored in the Cliffside Field in the year 2,000 with evidence of value at that point ranging from $75 to $100 per Mcf up to unknown values.

With these "markets" in mind, and in arriving at its ultimate conclusion as to value, the Court has considered evidence provided in the gas purchase and gas exchange contracts between the pipeline companies involved in these interpleader actions and their suppliers; gas purchase contracts between other parties which involved sales of "helium bearing natural gas;" gas purchase contracts by intrastate purchasers which were not subject to FPC rate regulation; various arrangements made by the United States for gas supplies in the operation of government helium extraction plants; the processing agreements made between the Helex companies and their pipeline suppliers; and arrangements and payments made by "private" helium extracting companies which were not involved in the conservation program. In addition to such contractual evidence, the Court has also fully considered evidence produced by all parties concerning "costs" of extracting helium, appropriate rates of return to both the Helex companies and lessee-producers, as well as the opinions of numerous experts who testified as to their opinion of the reasonable value of contained helium at the wellhead. Before discussing such evidence in

greater detail, the Court will attempt to summarize the contentions of the parties concerning "value."

### Lessee-Producers and Landowners

Briefly stated, the sole theory of value offered by Lessee-Producers and their co-parties in interest, the Landowners, was based upon the premise that there were no comparable sales of commingled helium at the wellhead by which value could be ascertained, and that therefore, the proper method to arrive at value was to use a "proceeds less expense" approach to the question, so as to "work down" to a proper figure. In applying this theory, the Lessee-Producers urge that the first free, open, competitive market for helium is that of sales of Grade A helium, the state in which helium is bought by and sold to, the ultimate consumer. Thus, the Lessee-Producers start their "work down" approach, not with the *actual* proceeds received by the Helex companies from sales of conservation helium to the Bureau of Mines, which was approximately $12.00 per Mcf for contained helium in the crude helium mixture,[21] but rather with a figure of $20.00 per Mcf which they represent to be a conservative, average estimate of the "market value" of Grade A helium sold to ultimate consumers during the years 1963–1971.

From this figure of $20, the Lessee-Producers would deduct the "cost of purification" of crude helium into Grade A helium, estimated to be $2.00 per Mcf,[22] and then subtract "costs of extraction" to arrive at a final value for the helium content of the gas stream processed in each individual helex plant for each of the several years.

The "costs of extraction," [LPX 2–19] were computed by taking operating expenses from company records (with certain adjustments believed to be required by Lessee-Producers' experts), adding on a figure which the producers considered to be a "fair rate of return" on the helex companies' investments," [23] and then deducting from these expenses a figure determined to be a "by-product liquids credit," which was arrived at by computations concerning profits realized by the Helex companies from their liquid hydrocarbon extraction operations, which were carried on in conjunction with helium extracting activities.

The results of these various, elaborate computations produced widely varying "values" within each Helex plant, and from year to year, such variations of course, resulting from comparative effi-

---

21. Proceeds actually received from sales to the Bureau of Mines, 1962–1971 were found in LPX 2–20:

Sales of Helium-Gas Mixture to U.S., per Mcf

| Helex Co. | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|---|---|---|---|---|
| Northern | $11.188 | 11.184 | 11.187 | 11.216 | 11.296 | 11.485 | 11.677 | 11.871 | 12.184 |
| Cities | | 11.833 | 11.853 | 11.880 | 11.948 | 12.080 | 12.302 | 12.536 | 12.849 |
| National | | 11.775 | 11.798 | 11.851 | 12.002 | 12.231 | 12.445 | 12.70 | 13.076 |

The figures for 1971 were: Northern $12.410; Cities Service, $13.090, and National $13.516.

---

22. See LPX 2–15; Garwin 1:170. Cost of purification. i. e., further cooling and processing of crude helium (approximately 70% helium, 30% nitrogen) into Grade A helium, i. e., 99.99% pure helium. The $2.00 cost figure was disputed by Helex witnesses.

23. See LPX 2–23A, and Dunn 5, 6:530–590. Witness Dunn's "hurdle rate of return" for Cities was 6.50%, for Northern, 6.89%, and for National, 7.60%. Actual realized rates to be gained from these "hurdle rates" were more, as exemplified in Schedules 13, 20 and 36, LPX 2–23A. For 1971 rates of returns on gross investment would be 9.36%, 11.02% and 12.84% respectively. [Dunn 6:588]

ciencies and costs within each plant, and, depending in part, upon profits made from extraction of liquid hydrocarbons. Ultimate values, according to Lessee-Producers are set out in LPX 2–24, as explained by Dunn: 6:592 et seq.:

#### COMMINGLED HELIUM EXTRACTED BY CITIES SERVICE HELEX, INC.
##### 1963–1971

| | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum market Value of Grade A Refined Helium | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 |
| Cost of Purification of Helium Gas Mixture (crude helium) | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 |
| Cost of Extraction by Helex Company | $15.26 | $ 6.61 | $ 4.96 | $ 3.74 | $ 2.21 | $ 4.17 | $ 5.38 | $ 3.85 | $ 4.15 |
| Value of Commingled helium at Lessee-Producer delivery point | $ 2.74 | $11.39 | $13.04 | $14.26 | $15.79 | $13.83 | $12.62 | $14.15 | $13.85 |

#### COMMINGLED HELIUM EXTRACTED BY NORTHERN HELEX COMPANY
##### 1963–1971

| | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Market Value of Grade A Refined Helium | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 |
| Cost of Purification of Helium Gas Mixture (crude helium) | $ 2.00 | $ 2.00 | $ 2.00 | $2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 |
| Cost of Extraction by Helex Company | $10.23 | $ 5.49 | $ 5.79 | $ 5.89 | $ 5.36 | $ 5.68 | $ 5.39 | $ 5.40 | $5.39 |
| Value of Commingled Helium at Lessee-Producer delivery point | $ 7.77 | $12.51 | $12.21 | $12.11 | $12.64 | $12.32 | $12.61 | $12.60 | $12.61 |

#### COMMINGLED HELIUM EXTRACTED BY NATIONAL HELIUM CORPORATION
##### 1963–1971

| | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Market Value of Grade A Refined Helium | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 |
| Cost of Purification of Helium Gas Mixture (crude helium) | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 | $ 2.00 |
| Cost of Extraction by Helex Company | $ 5.26 | $ 5.26 | $ 3.90 | $ 2.51 | $ 1.80 | $ 3.17 | $ 3.63 | $ 3.74 | $ 3.60 |
| Value of Commingled Helium at Lessee-Producer delivery point | $12.74 | $12.74 | $14.10 | $15.49 | $16.20 | $14.83 | $14.37 | $14.26 | $14.40 |

When the above values are converted into cents, per Mcf for the whole stream of natural gas delivered from the wellhead, the result is approximately 3.5 cents per Mcf for natural gas delivered into the Northern plant, 4.0 cents per Mcf for natural gas delivered into the Cities Service Helex plant, and 4.5 cents per Mcf for natural gas volumes delivered into the National Helium plant. [LPX 2–100] [24]

The Lessee-Producers' approach to valuation of the helium content of helium bearing natural gas was successfully urged by the producer in Ashland Oil, Inc. v. Phillips Petroleum Co. (N.D.Okl. 1973), 364 F.Supp. 6, appeal pending, a suit which involved the Phillips' Helex plants in Texas. In that instance, where the Phillips' plant was selling crude helium to the Bureau of Mines at a base price of $10.30 per Mcf, the Court found minimum values of contained helium to be within a range of $14.19 per Mcf to $16.45 per Mcf for gas processed at the Phillips' Sherman plant, and within the range of $12.07 per Mcf and $13.19 per Mcf for gas processed at the Dumas, Texas plant.

## Helex Companies

The Helex companies have not abandoned their contention, rejected by the Court of Appeals, that the FPC has jurisdiction over the commingled helium delivered at the wellhead, pursuant to the gas sales contracts. Since the Court of Appeals has ruled definitively on that issue, no further discussion need be had concerning the merits of this position.

The Helex companies further contend that the helium contained in the natural gas stream, at the times and places of sale by the Lessee-Producers to the pipelines, had no economic value except as a part of the total volume of gas sold, and accordingly, the "reasonable value" of such helium is the unit price expressly agreed upon by the parties in the gas sales contracts, whether that price be 6¢, 10¢, 12¢ or 16¢ and that such agreed price should, in each instance, be applied against the volumes of helium contained in the gas sold by the Lessee-Producers which was subsequently processed for helium extraction and sold to the United States.[25] [See Tr. 19:2094]

---

24. The cents per Mcf for total volumes of the entire gas stream delivered into the extracting plants was arrived at by a formula of dividing total helium per Mcf delivered to the government, by the gross Mcf of gas delivered from the wellhead, times the reasonable value of helium, as calculated by the Lessee-Producers in LPX 24.

The figures appearing in LPX 2–100, were provided at the request of the Court [Tr. 8:889–892] and appear as *cents* per Mcf:

| | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|---|---|---|---|
| Cities Service | 0.24¢ | 2.86¢ | 4.06¢ | 4.81¢ | 5.38¢ | 5.05¢ | 3.65¢ | 3.80¢ | 3.84¢ |
| National Helium | 4.08¢ | 4.32¢ | 5.03¢ | 5.10¢ | 5.05¢ | 4.37¢ | 4.62¢ | 4.42¢ | 4.55¢ |
| Northern Helex | 0.77¢ | 2.81¢ | 3.25¢ | 2.93¢ | 3.48¢ | 3.74¢ | 3.88¢ | 3.36¢ | 0.79¢ |

At the request of the Court, certain other exhibits were offered by the Helex companies concerning "proceeds less expense" computations:

NOX 60 uses Dunn's "rate of return" 6.89%, and shows a resulting loss of $13 million on the Northern conservation contract. [Tr. 12:1276–1279]

PEX 118, using actual proceeds received, indicates values for National plant, after taxes, with 14% return on investment. [Lawson 22:2401] These values range from a *loss* of $2.03 per Mcf in 1963, to a value of $2.51 in 1971, and an average value of 94¢ per Mcf.

LPX 2–112, offered in rebuttal, sets out values, less expenses, as recorded in company books and records.

---

25. The pipeline companies, Cities Service Gas Company and Northern Natural Gas Company, by way of counterclaim, seek credit for sums they have already paid at prices authorized by the Federal Power Commission for all volumes of the total gas stream which are attributable solely to the helium component. [See proposed findings, ¶ 47, Northern Helex, Dkt. No. 1704, and proposed findings, Cities Helex, ¶¶ 178, 179, Dkt. No. 1705]

In the absence of "an agreed reasonable value" by the parties to the gas purchase contracts, the Helex companies contend that considering evidence of comparable sales of helium bearing natural gas in the Hugoton area, and considering supplies available, the value of helium during the period of 1961 to 1971 ranged from 15¢ to 20¢ per Mcf, and in no event exceeded the sum of 25¢ per Mcf, which represents the Lessee-Producers' average costs of producing helium bearing natural gas. These figures were supported by expert opinions by Max Arnold, a professional appraiser, who analyzed numerous interstate and intrastate gas sales contracts, in relation to supplies and demand for helium bearing natural gas; [Helex X 316, 328, Tr. 21:2522] [26] Sherman Clark, [Tr. 10:1096, 11:1120; 1143–1144, Helex X 309] an expert in economics, who analyzed value in relation to supply and demand, and concluded that the value ranged from 15 to 20 cents per Mcf for contained helium; and Dr. Walter Morton, an expert in the fields of rate return and economics. [Tr. 15:1566–1577] Dr. Morton analyzed value in terms of cost to the Lessee-Producers in producing the contained helium. In other words, a type of "work-up" method by which he concluded that the producers should be entitled to their cost of production for each Mcf of contained helium, plus a "fair rate of return" of about 16% on *their* investment. Using this approach, Dr. Morton concluded that the reasonable value of contained helium at the wellhead for years 1961–1972 ranged from 25 cents to 45 cents per Mcf for contained helium. [27]

**J. Indicators of Value.**

The Helex Companies and the United States urge that ample market data exists concerning "comparable sales," from which a determination of reasonable value can be made without resort to the proceeds-less-expense theory relied upon by Lessee-Producers. Evidence concerning such comparable transactions may be summarized as follows:

**VALUE OF HELIUM**
**PRIVATE EXTRACTING PLANTS—**
**HUGOTON AREA**

Since the 1960 Helium Act Amendments, three private extraction plants operating in the Hugoton area have supplied significant quantities of Grade A helium to commercial markets—the Kansas Refined Helium Company, Otis, Kansas, processing gas with approximate helium content of 1.30%; the Alamo Chemical Plant at Elkhart, Kansas, processing gas of approximately .59% helium content; and the Sunflower Plant, at Scott City, Kansas, owned by Cities Service Cryogenics, Inc., and Heli-

---

**26.** Arnold's testimony is summarized in Helex Ex. 328, 316. This opinion was based upon consideration of interstate and intrastate gas sales contracts; a cost approach, and an "income approach", which he rejected as inapplicable to sales of commingled helium at the wellhead.

Arnold's evaluations for each year were as follows:

| | |
|---|---|
| 1961—15 cents per Mcf | 1967—16.5 cents per Mcf |
| 1962—15.5 | 1968—17 |
| 1963—15.5 | 1969—18 |
| 1964—16 | 1970—19 |
| 1965—16 | 1971—20 |
| 1966—16.5 | |

**27.** Morton's figures were: [Tr. 15:1572, 1577]

| | |
|---|---|
| 1961—25 cents per Mcf | 1967—35 cents per Mcf |
| 1962—25 | 1968—37 |
| 1963—27 | 1969—39 |
| 1964—29 | 1970—41 |
| 1965—31 | 1971—43 |
| 1966—33 | 1972—45 |

Exhibits relating to producer's costs appear as Helex Exs. 301, 302, 304, 305 and 307.

um, Inc., a subsidiary of Kansas-Nebraska Pipeline Company, processing gas containing approximately .50% helium.

### Kansas Refined Helium Plant, Otis, Kansas

Gas processed through the Otis Plant comes from three different sources. [Tr. 1:76, 77]

1) Leasehold gas which the owner, George Angle, procured from his own gas wells drilled under the name of Frontier Oil Company; [USX 26, p. 105; Lippert v. Angle (1973) 211 Kan. 695, 508 P.2d 920]

2) gas purchased in 1968 from Kansas-Nebraska Natural Gas Company; [USX 27]

3) crude helium purchased from other extraction plants. [USX 28, 29; Tr. 13:1365; 19:2156-60.]

In Lippert v. Angle (1973), 211 Kan. 695, 508 P.2d 920, the Kansas Supreme Court determined that the actual "market value" at the wellhead of gas produced by Angle from the Reichel field in Rush County, Kansas was 13 cents per Mcf less certain BTU adjustments and cost of compression, from date of first production to February 1, 1967, and thereafter was 14 cents per Mcf. Angle's leases were secured during the 1960's in order to develop helium bearing gas reserves in sufficient quantities to support his liquid helium plant. Gas wells in the Reichel field had previously been connected to the Kansas-Nebraska pipeline gathering system, and gas had been processed for helium extraction by the United States in a plant operated by the government at Otis, Kansas from 1945 to 1968. More than 340 of Angle's royalty owners in the Reichel field executed Division Orders and Gas Purchase Agreements which provided for royalty payments on a value of 14 cents per Mcf. These Division Orders were specifically designed to give Angle full title to all of the gas, including hydrocarbons and non-hydrocarbons.[28]

The second source of gas for Angle's Kansas Refined Helium Plant at Otis was gas purchased from Kansas-Nebraska Pipe Line Company, under contract dated March 5, 1968. [USX 27] The value agreed to for the right to extract helium from this gas was the "Industrial Interruptible Tariff (Schedule 7-1) established by the State Corporation Commission of Kansas. The tariff rate in March, 1968, ranged from 22 cents to 60 cents Mcf, depending on the volume involved. [USX 42] This gas was returned to Kansas-Nebraska after processing through the Otis Plant and sold in intrastate commerce. This gas was not subject to regulation by the Federal Power Commission. [See Depo. S. D. Ford, Jr., USX 33 pp. 5, 6, 18-22, 53] As to this gas, Kansas Refined Helium was not required to pay any more for the gas than would any other industrial user.[29]

The third source of helium used by Kansas Refined Helium at Otis, Kansas, was crude helium purchased from the Helex companies involved in this action. Kansas Refined Helium paid about $12.45 per Mcf for crude helium purchased from the National Helium extraction plant at Liberal, Kansas, and $9.50 per Mcf for crude helium purchased from the Northern Helex conservation plant at Bushton, Kansas starting in 1971. [USX 28, 29; Tr. 13:1365; 19:2156-60; 2:226, 227][30]

---

28. Comparable payment for right to extract helium at wellhead, if helium content was only .4% instead of 1.8% (as in the Reichel Field) would be 3 cents per Mcf of helium removed. [CSX 22; Bowers, 16:1687 et seq.]

29. Comparable payment for right to extract helium from a .4% gas stream, instead of a 1.3% helium gas stream, as was the content of the Kansas-Nebraska gas, would be 34 cents per Mcf of helium removed. [CSX 22]

30. The Northern sale was to be f. o. b. Otis Plant, via the Bureau of Mines helium pipeline system. When the Bureau denied use of its pipeline, Northern was required to deliver the crude helium to Otis, Kansas in high-pressure gas trailers at a cost of 50 to 75 cents per Mcf. [Garwin, Tr. 226, 227]

*The Greenwood Plant, Alamo Chemical Company*
*Elkhart, Kansas*

The Greenwood plant is a 50–50 joint venture of Alamo Chemical Company, subsidiary of Phillips Petroleum Company, and Gardner Cryogenics, which produces Grade A helium in liquid and gaseous form. The total gas supply for this plant comes from Colorado Interstate Gas Company, and contains about .59% helium content. The gas sales agreement for this gas, dated April 1, 1965, between Alamo Chemical and Colorado Interstate appears as USX 25. This agreement grants Alamo the right to process gas and "to extract, take, own and dispose of all helium" contained in the gas, as well as to extract and own liquid hydrocarbons from that gas. Payment provisions cover both of these extraction rights: [USX 25, p. 26]

"Two Dollars ($2.00) per Mcf for the contained helium extracted and saved at the Greenwood Plant . . . ;"

and,

"for the volumes of shrinkage, fuel, vent gas and helium concentrate used or disposed of by Alamo at the Greenwood Plant. . . . Twenty-one Cents (21¢) per Mcf. . . ." [Tr. 2d 20:2258][31]

*Sunflower Plant—Cities Service Cryogenics*
*Scott City, Kansas*

All of the gas which contains about .50% helium, for this private plant, owned jointly by Kansas-Nebraska and Cities Service Cryogenics, is supplied by Kansas-Nebraska, which is paid a processing fee per Agreement dated 6/14/66, as amended by letter agreement of 4/4/67. [USX 5, 30, 31, and 32] This fee covers the right to process and extract both liquid hydrocarbons and helium, with payment being at the rate of $2.00 per Mcf of helium sold by the Sunflower plant, and shrinkage at the "price set forth in Kansas-Nebraska's Tariff No. 8–3 on file with the Kansas Corporation Commission." [USX 31, p. 10][32]

Kansas-Nebraska obtains about 25% of the Sunflower Plant gas from the nearby Bradshaw Field, which has a helium content of about .8%. [Ford Depo., Ex. 33, pp. 16, 25] The gas purchase contracts negotiated by Kansas-Nebraska in the Bradshaw field specifically provide for passage of title to the helium constituent.[33] [USX 40(a)–40(y); USX 41(a)(b)] Most of these contracts were signed between 1963 and 1965 and provided for a base price of 12.5 cents per Mcf for the total gas stream, escalating 1 cent each five years to 15.5 cents per Mcf. Additional contracts were signed after 1965, one in 1970, with base price of 15 cents per Mcf [USX 40(y)]; and one as recently as February 3, 1972, which provided for a base price of 25 cents per Mcf [USX 40(u)].

Two of the Kansas-Nebraska Bradshaw Field contracts contained somewhat unusual language. The contract with Texaco, dated 1/24/64 [USX 41(a)] provided:

It is recognized that the gas to be delivered hereunder contains helium

31. Comparable payment for right to extract helium from a .4% gas stream processed at the conservation plants would be $1.22 per Mcf of helium extracted. [CSX 22; Bower, 16:1687 et seq.]

32. Comparable payment for right to extract helium from Hugoton gas of .4% helium content would be $1.13 per Mcf of helium extracted. [CSX 22; Bowers, 16:1687 et seq.]

33. e. g., USX 40(a), gas purchase contract, Kansas-Nebraska, Buyer, Texaco, Seller, dated 1/24/64, Article III, p. 9:

"The gas shall be in its natural state as produced, including all hydrocarbon and nonhydrocarbon substances, *including but not limited to helium therein contained* and gasoline produced therewith, except that Seller shall have the right to retain such liquid hydrocarbon substances (inclusive of crude oil) as shall be separated by Seller from the production of the respective well or wells by means of conventional oil and gas separator equipment installed on the lease by Seller, in which event the delivery point shall be at the outlet of the separator." [Emphasis supplied.]

and that Seller's ownership of such helium may be disputed. It is further recognized and agreed that in determining the price to be paid for the gas sold and delivered under this contract *that helium has been given a value of 1¢ x actual BTU/ 950 for each one thousand (1,000) cubic feet of gas.* Seller is hereby given the option, to be exercised in writing prior to the date of initial delivery to either: [Emphasis supplied.]

(a) Accept payment in full of contract price as herein provided and assume full liability therefor under Article IX of this contract, or

(b) Accept payment of the contract price as herein provided less the value of the helium (1¢ x actual BTU/950) and Buyer shall retain the amount attributable to the value of helium and assume the full liability for accounting to the owner of the helium (if said owner is not Seller) for the sum so retained."

The Kansas-Nebraska contract with Humble Oil and Refining Company, dated March 18, 1965 [USX 40(o)] contained the following provision under Article III, "Quality," p. 10:

"Notwithstanding any other provision hereof to the contrary, it is recognized that litigation is now pending covering title to the helium constituent, if any, of the gas, and it is understood and agreed that if it is finally determined that Seller did not have title thereto at the time of the execution of this contract, then Seller shall remove such helium constituent prior to delivery of the gas . . . or, failing to do so, shall indemnify Buyer, pursuant to the warranty provisions set forth in Article IX hereof. . . ."

## PRIVATE EXTRACTING PLANT—ARIZONA AREA

### Kerr-McGee Plant—Pinta Dome, Arizona

Kerr-McGee was the first private plant to have helium for sale after enactment of the 1960 Helium Act Amendments. Gas processed at this plant has about 8.4% helium content, is not suitable for fuel and is produced solely for the purpose of helium extraction. [USX 2, 5] This plant extracts Grade A helium in gas or liquid form, and has sold this at prices ranging from $19.00 to $35.00. [LPX 2–14; USX 70][34]

Part of the gas supply for the Pinta Dome Plant comes from the United States. Kerr-McGee pays a sliding scale price dependent upon helium content of the gas and the price Kerr-McGee is able to get for Grade A helium. [LOX 206, 1st trial] Assuming a $19.00 price for Grade A helium, with the raw gas stream containing 8%–8.49% helium, the price paid the United States would be about $2.88 per Mcf of helium removed.[35]

It is substantially less expensive to remove helium from gas with a high per cent helium content than from gases with lower content, assuming the same plant size is involved. This is, of course, because a smaller volume of gas must be processed to obtain any certain quantity of helium. Witness Bowers calculated that a comparable payment for the right to extract helium from Hugoton gas processed at the conservation plants would be 15 cents per Mcf of heli-

---

34. In the early years of operation, Kerr-McGee's only competition was with the United States and so it was able to sell Grade A helium at the government price of $35.00; when other private extracting plants began sales, Kerr-McGee was forced to reduce its price to meet competition. The Otis plant started production in April, 1966; the Greenwood in December, 1966, and the Sunflower in October, 1968. [See USX 2].

35. The price paid private royalty owners is higher. Under a 1966 judgment of the Arizona Superior Court, the price to such royalty owners, with $19 sales price and 8%–8.99% helium content—is figured on a price of $4.38 per Mcf of helium removed. [See LOX 843, 1st trial]

um extracted. [CSX 22, Bowers; 16:1687 et seq.]

## VALUE OF HELIUM GAS SUPPLIES FOR BUREAU OF MINES' PLANTS

Discussion of the government's experience in obtaining gas supplies for its extracting plants appears in this Court's prior opinion, 292 F.Supp. at pp. 648–652.

### Otis Plant, Otis, Kansas

This plant was constructed during World War II and gas was initially obtained from Producers Gas Company and Northern Natural Gas. When the plant reopened in 1951, additional gas was obtained under a 1952 contract with Kansas-Nebraska Gas Company. The prices in these contracts were the prevailing market prices for natural gas for fuel markets at the time of their execution.

In 1965, the Kansas-Nebraska contract was amended to provide the same price for contained helium as would be charged private users under the established Industrial Interruptible Rate. This plant was closed in 1968 because of a falling demand for helium. [Tr. 20:2308] At this time, the United States was paying the tariff rate set by the State of Kansas. 1% helium content; 10¢ Mcf base price [USX 43]; 15¢ base price [USX 44]; 19¢ Mcf effective 1/1/57 [USX 45]; base price adjusted to 16.97 cents Mcf [USX 47]. [USX 48, Ford Depo., USX 33, p. 22]. After the plant was closed, Kansas-Nebraska sold the same gas to Kansas Refined Helium on the same price terms.

### Exell Plant, Texas

This plant was constructed in 1943 and remained in operation until July, 1972. [USX 3] Gas was supplied by Colorado Interstate Gas Company, and up until 1958, the price paid was the prevailing market price for natural gas

for fuel markets. [USX 52] In 1962, the contract with Colorado Interstate was amended to provide for a base price of 20 cents per Mcf for total shrinkage with provision for re-negotiation of price five years thereafter.

In 1968, and 1969, negotiations began concerning the price to be paid for contained helium removed from Colorado Interstate gas processed at Exell, with the Bureau of Mines suggesting a price of 50 cents per Mcf through June, 1969, with increases in succeeding years to $2.00 per Mcf in 1974 and thereafter. [USX 53] Colorado Interstate agreed essentially to this proposal [USX 55, 56]. This agreement was never formalized, due to "uncertainties in the future of the helium program" [USX 57] and the United States finally terminated the Gas Processing Agreement with Colorado Interstate Gas Company, effective July 1, 1973. [USX 58, 59]

### Keyes Plant, Oklahoma

The gas purchase contract with Colorado Interstate Gas, negotiated in 1958, is discussed at p. 651 of 292 F.Supp. and appears as LPX 2–34 in this record.

In this contract, the United States agreed to pay, in effect, $2.00 for the right to process sufficient gas to yield one thousand cubic feet of helium, plus 26¢ Mcf for shrinkage.[36] Certain obligations were placed on Colorado Interstate in connection with payment of this fee. The helium content of this gas is about 2%. [USX 5] Dean Bowers calculated that a comparable price for extraction of one Mcf of contained helium in .4% helium gas would be 50 cents per Mcf of contained helium extracted. [CSX 22; Bowers, 16:1687 et seq.]

### Navajo Plant, New Mexico
(See 292 F.Supp. at 650–651)

The initial gas supply for this plant came from the Rattlesnake Field, which gas contained 7.6% helium and was

---

36. ¶ 6.2 of contract, LPX 2–34, p. 5, provides for payment of 4¢ per Mcf for gas having helium content of 2%. Since 50 Mcf of gas would have to be processed to obtain 1 Mcf of helium, the processing fee amounts to $2.00 per Mcf helium recovered.

non-combustible. The well was drilled by Continental Oil Company under a lease granted by the Navajo Tribe. For purposes of computing a proper royalty for the Tribe, the Court of Claims placed a value on each Mcf of contained helium at $2.99 per Mcf of contained helium. [LPX 2–32, 2–30, 2–31] Navajo Tribe v. United States (1966), 364 F.2d 320, 334–338, 176 Ct.Cl. 502.

By 1955, the Rattlesnake Field was depleted and the United States contracted with Stanolind for gas produced from the Hogback Field in San Juan County, New Mexico. [LPX 2–33] This field contained gas with a 7.5% helium content and was not efficient as a fuel gas. The payment provided was 12 cents per Mcf for the gas stream, plus a 3 cent delivery charge. [LPX 2–33, ¶10, p. 5] This calculates to a payment of about $2.00 per Mcf of contained helium at the plant inlet, or, less delivery charge, about $1.55 Mcf at the wellhead.[37]

In 1959, the United States signed a contract with Pan American Petroleum Corporation covering gas produced from the Navajo C–1 well, having a helium content of about 5.6%. The price calculated for the helium content was essentially $2.00 Mcf, per the formula followed in the Keyes contract. 292 F. Supp. at 652. [Tr. 1st 66:6318–6319][38]

In 1962, gas was purchased from Continental Oil Company from production in the Table Mesa Field. 292 F.Supp. at 650. The United States agreed to pay 23 cents per Mcf for the whole natural gas stream considering this price to contain a 11.27 cent payment for helium; the price for contained helium from this field would calculate to about $2.00, a price consistent with the "Keyes Formula." [Tr. 1st – 66:6319–6320]

## INTRASTATE SALES OF HELIUM BEARING NATURAL GAS

The evidence established that major intrastate sales of helium bearing natural gas were made at rates comparable to interstate sales which were subject to FPC rate schedules. [Hofsess 16:1765–1773; Morton 15:1612–1613; Arnold 21:2502]

Major Kansas purchases were:

Anadarko Production Company, 16.0¢ per Mcf, 1963 to 19.33¢ per Mcf in 1971 for wellhead purchases, and from 16.5¢ per Mcf in 1961 to 17.09¢ in 1971 for gasoline plant and field line purchases.

Kansas Gas Supply Corporation: 18.0094¢ Mcf in 1961 to 19.0737¢ in 1971 for wellhead purchases and from 13.0¢ per Mcf in 1961 to 17.24¢ per Mcf in 1971 for field line purchases.

Kansas Power and Light Company, paid 12.45¢ per Mcf in 1961 to 17.17¢ Mcf in 1971 for wellhead purchases.

Plateau Natural Gas Company paid 10.5¢ per Mcf to 13.0¢ in 1962 and from 12.5¢ to 19.0¢ per Mcf in 1971;

Kansas-Nebraska Natural Gas Company paid 10.0¢ to 12.0¢ per Mcf in 1961 and 10.0¢ to 15.0¢ per Mcf in 1971.

Major Oklahoma purchases were:

Arkansas Louisiana Gas Company paid 12.0¢ in 1963 to 13.0¢ per Mcf in 1971.

Oklahoma Gas and Electric Company 15.0¢ in 1965 to 16.0¢ per Mcf in 1971.

Oklahoma Natural Gas Company paid 12.25¢ in 1961 to 18.0¢ in 1971.

The Court considers such evidence of intrastate sales to be largely irrelevant to the question of the value of the contained helium which is the subject matter of these proceedings, inasmuch as these were sales of helium bearing natural gas for purposes of fuel, and none were shown to be related to any valuation of the helium content of the natural gas stream.

## OTHER CONTRACTUAL RELATIONS

The Helex Companies and the United States presented evidence of other

---

37. It would be necessary to process about 13 Mcf's of gas containing 7.5% helium to produce 1 Mcf of helium.

38. See also LPX 2–35; 2–36A, 2–36B. The price of 19¢ per Mcf was broken down as follows: 11.6¢ helium; 1.8¢ hydrocarbon, and 5.6¢ delivery.

contractual negotiations during the 1960's in which the parties attempted to deal with the "value" of helium, or in which, it is suggested, that the parties recognized that the helium content of natural gas had no value above its volumetric value as a part of the whole gas stream. This evidence included:

### Phillips Casinghead Gas Contracts

The Phillips Petroleum Company operates two helium extraction plants at Dumas and Sherman, Texas. The helium content of gas supplying these plants is somewhat higher than the .40 to .45% content of gas serving the Cities, Northern, and National plants since the Texas gas helium content ranges from .65%. to .78%. [USX 5] Although casinghead gas was not being processed in Phillips' helium extracting plants, those holding casinghead gas contracts with Phillips were affected since operations at Dumas and Sherman would affect the "weighted average price" used in computing payments due under the casinghead contracts by approximately 1 cent per Mcf [USX 23; LPX 101; Tr. 20:2274] Since these pricing provisions depended upon a determination of the value of helium extracted by Phillips in May, 1962, the "value" proposed by Phillips was set at the figure of $2.35 Mcf.[39]

Several hundred holders of Casinghead Gas Contracts signed amendments or new contracts, spanning a period of 1962 to 1973,[40] containing the following provisions: [USX 23, Blank contracts ¶ 8]

> "The price received by Buyer and its subsidiaries from any sale of helium as a separate product (whether sold separately or contained in a helium gas mixture in which helium is the product for which payment is made) shall be deemed to be $2.35 per Mcf of helium contained in any delivery of helium or helium-gas mixtures, without deduction therefrom."

Such provision only resulted in a value of ⅔ of $2.35 being placed on the helium extracted (the holder of casinghead gas contract only received ⅔ of "weighted average price"), or approximately 1 cent per Mcf of the whole gas stream containing helium in the natural, commingled state. [USX 23, ¶ 7B; Cullender, 20:2262–2274]

### Phillips Pioneer Production Company Contract

In 1964, Phillips entered into a gas exchange agreement with Pioneer Production Corporation, wherein Phillips was able to process Pioneer's gas through the Dumas Plant for both helium and hydrocarbon extraction. [USC 24]. Phillips paid Pioneer a "processing fee" of $2.00 per Mcf for the helium contained in the gas delivered by Pioneer and for the right to extract hydrocarbons, plus a shrinkage payment of 21 cents per Mcf.[41] The helium content of this gas was about 1%. When the United States ceased accepting crude helium deliveries from the Dumas plant, Phillips stopped paying Pioneer the $2.00 processing fee, and a new gas exchange agreement is currently being negotiated. [Cox, 20:2241–2249]

### Contracts Filed With FPC Covering Helium

During the 1960's many gas purchase contracts in the Hugoton area which specifically provided for title to helium were filed with the FPC. (USX 39 consists of 25 miscellaneous contracts,

---

**39.** In a letter to holders of casinghead gas contracts dated 5/14/62, Phillips stated: [LPX 101; USX 23]

"In our negotiations with the U. S. Bureau of Mines for the recovery of helium at Dumas Plant the value for recovered helium was considered to be $2.35 per Mcf."

**40.** Those signing included: Socony Mobil (1962); Gulf Oil (1962, 1973); Cities Serv-ice Petroleum Co. (1962); Cities Service Oil Co. (1966); Sinclair (1969); Continental Oil Co. (1972); Pan American (1968); and Amoco (1973).

**41.** In addition to right to extract helium and hydrocarbons, Phillips also received the right to return only 92.5% of the volume of gas initially received. [USX 24 (Article III, § 5 of 3/3/65)]

and USX 40 contains 25 contracts relating to the Bradshaw Field which supplies the Sunflower Plant. These contracts are summarized in USX 61). There is no provision in any of these contracts, with prices ranging from 6¢ Mcf to 25¢ Mcf, which called for an adjustment in price depending upon whether or not helium is extracted by either party.

### Panhandle Eastern Contracts

Starting in 1960, Panhandle Eastern entered into a number of contracts with Lessee-Producers in which the helium content of the gas purchased was specifically mentioned. (Collected as USX 37(1), 37(14); summarized in USX 61).

Two of the contracts were with Ashland Oil [USX 37(1), 37(2)] made in 1960 and 1966. Under the first, Ashland reserved the option to extract helium, and if it did not, Ashland would *release all* further claim to helium contained in gas delivered . . . " This contract made no difference in the price to be paid by Panhandle for the gas, whether or not the helium was extracted by Ashland. Ashland has not in fact ever extracted any helium. Under the terms of the 1966 contract [USX 37(2)] Ashland was either to remove the helium prior to delivery, or indemnify the Buyer. The initial contract price under both of these contracts was 16 cents per Mcf.

Panhandle's contracts with Mobil Oil and Cities Service Oil contained similar provisions relating to helium, with no adjustment of price, regardless of whether or not helium was extracted prior to delivery to Panhandle. The initial price under both of these two 1960 contracts [USX 37(4), 37(6)] was 17 cents per Mcf.

None of these Panhandle contracts made any distinction in the price to be paid whether or not helium was removed by the Buyer or Seller, and all of these contracts covered areas having gas with a helium content of .4% or more. [See map, end of USX 61].

### Atlantic-Richfield, ElPaso Gas Exchange
#### [USX 38(a)–38(h)]

By contract dated March 11, 1965, [USX 38(a)] Atlantic-Richfield's predecessor, Sinclair Oil, sold production from 39,000 acres in Grant and Stanton Counties, Kansas, to ElPaso Natural Gas. The agreement clearly gave ElPaso the right to extract non-hydrocarbons, and the initial price set for sale of the entire stream was 15 cents per Mcf.

"Processing Rights" granted in this contract [USX 38(a)] specifically provided that:

> "As part of the consideration set forth in Article XII "Price," Seller conveys to Buyer the right to process the gas covered hereby for the extraction and recovery of any and all of its hydrocarbon and nonhydrocarbon substances."

On the same date, ElPaso agreed to exchange this gas with Northern Natural Gas Company. [USX 38(f)] Northern was to pay back the gas from pipeline facilities in Yoakum County, Texas. The gas which has been delivered to Northern under this gas exchange agreement has been processed through either the Northern Helex Bushton conservation helium extraction plant, or through the private Sunflower helium extraction plant opration by Cities Service [See Tr. 14:1493, 1494, and discussion of this gas exchange agreement, *infra*.] .

Prior to sale of this gas to ElPaso, the gas had been sold to Cities Service for 15 cents per Mcf, subject to refund, since the FPC guideline price for the area was 11 cents for old contracts. The parties tried to convince the FPC that the March, 1965 contract constituted a new sale since additional gas reserves were covered, and the right to extract helium had been conveyed. [USX 38(g), pp. 47, 48; USX 38(h), p. 24] The FPC accepted the price of 15 cents in August, 1967, but made that price subject to refund, noting that this was 1 cent below the "present area guideline for new contracts." [USX 38(h), p. 21]

### Ashland Oil Company—Anadarko Proposed Contract

In 1965, Ashland Oil Company and Anadarko Production Company entered into a tentative contract for sale of helium bearing natural gas in Grant County, Kansas. The contract price was 13.5 cents per Mcf during the first five year period, and the parties attempted to resolve the question of title to helium in this manner: [USX 36, 36A, Warranty Clause, Article XIV]

" . . . provided, however, it is recognized that litigation is now pending concerning title to the helium constituent, if any, of gas, and it is understood and agreed that if it is finally determined that Seller did not have title thereto at the time of the execution of this Agreement, then Seller shall have the right to remove such helium constituent delivered hereunder to Buyer."

This contract was never implemented, inasmuch as the FPC did not release Ashland's prior dedication of gas reserves to Cities Service [USX 38(h)]

### Ashland Oil—Cities Service Arbitration Proceedings

In 1967 Ashland and Cities Service submitted for arbitration a gas sales contract dated March 12, 1948, which provided for periodic price renegotiation. [Ashland Ex. 5, 1st trial] The submission specifically recognized the problem of attributing a value to the helium content of the gas stream. The arbitrator, Mr. Gruy, by letter of March 29, 1967, found the fair, just and reasonable price of gas during a 5-year period ending June 22, 1971, to be 15 cents per Mcf. Mr. Gruy, in his deposition given in this case, stated:[42]

" . . . as with the Ashland case I have never found that the helium had any value at the wellhead to the royalty owners or the producers.

Q. Oh, you found that?

A. I found it had no value other than its value per Mcf.

Q. Part of the total stream?

A. Yes."

### K. The Court's Determination of Value.

In the foregoing discussion of the evidence the Court has attempted to summarize the factual background which bears upon the ultimate determination of value.

 In the first instance, the Court rejects the claimed values by Lessee-Producers for helium at the wellhead or central delivery points. It must be remembered that the basis of this Court's jurisdiction in interpleader is, in each case, determined by, and limited to, the "fund." The fund, in each case, has been defined as the proceeds received by each individual Helex company from the sale of crude helium to the United States, pursuant to the conservation contracts. The Court of Appeals itself realized that payments required relate only to the helium content of the processed gas: [441 F.2d at 723]

"We do not intend that payment to the lessee-producers or royalties to the landowners should include anything for the helium content of the nonprocessed gas. The record does not show any market for the helium commingled with the nonprocessed gas."

The Court of Appeals specifically defined the interpleaded fund as being: [Dkt. 1938, Order on Costs]

"The reasonable value at time of sale of the helium content of the natural gas which the Helex group has received from the Lessee-Producers, and which has been processed in the plants of the Helex group for the separation of helium from natural gas."

As previously noted, the sums paid by the United States to the Helex companies averaged within the range of $12.00 per Mcf for contained helium within the

---

42. The Gruy deposition is part of the record, but was not assigned an exhibit number. [See Tr. 22:2634, 2635; and Helex X 319; Tr. 2:233, 234]

crude helium mixture. When the Lessee-Producers come up with figures indicating values of helium to be as high as $16.20 per Mcf after extraction processes in the National Helium Plant for the year 1967, it is immediately apparent that they are reaching for sums beyond the jurisdiction of this Court. This result is illustrated by tables found in proposed findings submitted by Cities Service Helex [Dkt. 1705, p. 9] which reflect that the demand of the Lessees exceeds gross revenues of Cities by $6.9 million, in the case of Northern Helex by $2.9 million, and in the case of National Helium, by $21 million. The Lessee-Producers thus claim a total of $30.8 million more than the three Helex Companies grossed from their sales of crude helium to the United States, while at the same time asserting that the Helex Companies have recovered their costs of extraction and a rate of return on their investment.

In the opinion of the Court, the values set by the Lessee-Producers rest upon two erroneous premises: first, that the first market and sale of contained helium is that found in the market for Grade A helium which sold at prices ranging from $19.00 to $35.00 per Mcf; and, second, that the contracts of the Helex group with the Bureau of Mines, under the conservation program, were some sort of "open end" contracts, which would allow unlimited escalation of the price to be paid by the United States for crude helium.

In the first instance, the Court is of the opinion, and so finds, that for the purpose of this case, there were markets for the commingled helium as it passed from the wellhead to the pipeline companies, and from pipeline companies to the government, private, and conservation helium extracting plants.

In the second instance, the Court continues to believe that provisions in the conservation contracts relating to indemnification by the United States to the Helex Companies for sums beyond an approximate $3.00 per Mcf title liability exposure limit, continue to be just that—

indemnity arrangements between the Helex group and the United States, which inure solely to the benefit of the Helex group and not to third parties. The Court has therefore determined that any indemnity arrangements which exist between the government and the Helex group are irrelevant to the question of determining "reasonable value" of the commingled helium in question.

The fallacy of the Lessee-Producers' theory of value is further illustrated in its application. [See Tr. 7:760; 8:869]

If one would assume, according to witness Dunn's figures, that the value of helium is $14.00, and that the United States would pay all but $3.00 of that value under the purported "escalation clause" appearing in the conservation contracts, then the United States would ultimately pay an additional $11.00, plus the $12.00 the government has already paid for crude helium, for a total of $23.00 payment for *crude helium,* when the witness Dunn had already set a value of $20.00 for Grade A helium as the starting point in his own computations.

Another example of the application of Dunn's computations reveals that since the costs of extracting helium in each plant were reduced by a portion of the profits made in that plant from extraction of liquid hydrocarbons, this increased the ultimate "value" figure attributable to the commingled helium. This means, of course, that portions of these hydrocarbon profits will be going to the Lessee-Producers, and that, assuming that the United States will ultimately pay values above the $3.00 figure, those profits would be paid from the government treasury.

Finally, the Court can only say that the Lessee-Producers' theory of arriving at value is simply unreasonable and that determinations of the value of "raw materials" is not determined upon a "proceeds less expense" theory in the American economy. The price that a farmer receives for wheat, or the price that he receives for feed grains is not determined by "working back" from the retail price

of bread or meat. This was illustrated in the testimony of Dr. Morton, an economist, in the following terms: [Morton 15:1596, 1597]

" . . . one does not find the value of, say, wheat in Kansas, by taking the price of bread, deducting from the price of bread the grocer's profit, and then the drayman's profit who hauls it to the grocer, then the baker's profit, and then the miller's profit, plus his costs, and the railroad's profit in hauling it to the mill, plus its costs, in order to find the price of wheat."

and, in the case of cattlemen:

"I want a certain compensation for my work and effort and capital in feeding cattle, therefore, I am only getting 40 cents instead of 50 cents, I expect the fellow who sold me the feed grains to take a reduction now in his price that we paid him. Well, it doesn't work that way in our system."

■ The Court likewise feels that the question of "value" should not be arrived at by means of determining what the profits and rate of return to the Helex Companies and/or the Lessee-Producers *"ought to be."* It is no part of the Mandate of this Court to assume rate-making jurisdiction over the private helium industry.

■ The Court further concludes that it must reject the contention of the Helex Companies that reasonable value is to be determined according to the existing gas purchase contracts between Lessee-Producers and the pipeline companies. The Court can only say that it believes

this result is required by the Mandate of the Court of Appeals, and the interpretation of the *Grounds* opinion in Phillips Petroleum Company v. Texaco, *supra,* 415 U.S. 125, 129, 94 S.Ct. 1002, 1004, 39 L.Ed.2d 209, 213.[43]

The Court fully appreciates and accepts evidence offered by the Helex Companies and the United States concerning the relationship between supply and demand for helium bearing natural gas in the Hugoton area during the 1960's, which evidence established to the Court's satisfaction that, viewed in the abstract, commingled helium in helium bearing natural gas has no value above its volumetric value. Simply stated, it had no value unless it was extracted from the whole gas stream.

The Court believes that the situation with respect to commingled helium in the Hugoton area was best explained by witness Clark, an economist, in the following terms: [11:1143]

"Thus, prior to the sixties helium had zero value in the Hugoton-Anadarko area and if, in fact, the government does terminate the contracts in the future helium will have zero value and in the sixties half of the helium in the flowing gas had zero value, which means to me that helium is a commodity surrounded in time and space by zero value over and above its volume value."

Be that as it may, the Court, however, must agree with the contention of the Lessee-Producers that the task of this Court, upon remand, was not to set a value upon *helium bearing natural gas.*

---

43. The appellate court disposed of the Helex companies' contention regarding the applicability of the gas purchase contracts by its comments found at p. 719 of 441 F.2d, in which it concluded that this Court's opinion regarding the parties' right to contract with reference to helium was "startling" when this Court found that § 11.

"' . . . does not *require* that persons contracting for the sale of *gas* contract separately for the sale of the helium constituent. It merely permits them to do so, and when they have not, the contract must stand as it is written.' 292 F.Supp. at 680."

In explaining this conclusion, the appellate court stated, at p. 722 of 441 F.2d:

"The activities of the Little Red Hen were not those of a public utility, and neither the product nor the ingredients thereof were subject to governmental rate regulation. Therein lies the difference. In our opinion private contract law and the principles applicable thereto are not controlling. This makes it unnecessary *for us to delve into the many* cases and texts bearing on the respective rights of parties to private contracts."

Our task is to value the commingled helium which was in fact extracted from the natural gas stream. This is the subject matter of these interpleader suits, the Court of Appeals has determined that the Helex Companies obtained this commodity without paying for it, and that the Lessee-Producers and Landowners are entitled to payment for the reasonable value of the contained helium. This Court must operate under the Mandate of its appellate court which has determined that payment must be made: [441 F.2d at 723]

> "The claim of the lessee-producers is that the Helex companies have received the gas without paying for the helium content. In ordinary circumstances restitution or rescission might be an available remedy. Here, neither is practical or legally possible, *but when payment is required and not made, the title fails just as surely as it does where either restitution or rescission is appropriate.*" [Emphasis supplied.]

In arriving at its value figures, this Court has carefully considered evidence pertaining to sums of money which both government, private, and conservation helium extracting companies were willing to pay pipeline companies and producers or royalty owners for the right to extract commingled helium from natural gas streams, as discussed *supra,* in this opinion. An expert witness, Dean Bowers, evaluated contracts and agreements under which the government Keyes plant, and the private extracting plants operated by Kansas Refined Helium, Alamo Chemical Company, Kerr-McGee Company and the Cities Cryogenics-Kansas Nebraska Sunflower Plant obtained gas supplies for their operations. He made certain adjustments according to helium content of the gas supplying each plant, and made certain calculations determining values of rights and duties involved in these agreements, and determined that the average payment for contained helium made by these commercial helium extraction plants averaged 61 cents for all plants, and averaged 75 cents for private plants which had no connection with the United States government. [Bowers 16:1687 et seq.; Cities Helex Ex. 22]

■ After review of all of the evidence, it is the finding of this Court that the reasonable value of the helium component of the helium bearing natural gas, at the point that it was delivered by the Lessee-Producers to the pipeline companies, which helium was thereafter processed and extracted by the three Helex Companies involved in this litigation, and which was thereafter sold to the United States pursuant to the three conservation contracts, is as follows:

| | | | | | |
|------|----|-------|-----|-----|--------|
| 1961 | 60 | cents | per | Mcf | of helium |
| 1962 | 61 | cents | per | Mcf | of helium |
| 1963 | 62 | cents | per | Mcf | of helium |
| 1964 | 63 | cents | per | Mcf | of helium |
| 1965 | 64 | cents | per | Mcf | of helium |
| 1966 | 65 | cents | per | Mcf | of helium |
| 1967 | 66 | cents | per | Mcf | of helium |
| 1968 | 67 | cents | per | Mcf | of helium |
| 1969 | 68 | cents | per | Mcf | of helium |
| 1970 | 69 | cents | per | Mcf | of helium |
| 1971 | 70 | cents | per | Mcf | of helium |
| 1972 | 70 | cents | per | Mcf | of helium |

### L. Allocation of the Fund.

Now that the Court has arrived at value figures, it is necessary to make some further determinations concerning those parties who are entitled to share in the distribution of the fund.

■ As a preliminary matter, the Court will state that it will be governed in these determinations by two essential guidelines:

First, the Mandate of the Court of Appeals which, in the Court's opinion, requires that the Helex Companies account for all helium which was extracted in their respective plants, and thereafter sold to the United States, pursuant to the conservation contracts. They are not accountable *in this action* for helium bearing natural gas which was bypassed around the plant, for helium bearing natural gas which was consumed as fuel within the plant, or for helium which

was extracted and then vented into the atmosphere, or for helium which was extracted and sold to parties other than the United States, or for helium which was extracted and then stored for their private account.

Second, the Court is mindful of the definitions of the classes of Lessee-Producers and Landowners who have an interest in the funds which are the subject matter of these interpleader suits. For instance, in the National Helium litigation, Case No. KC–1980, the class of Lessee-Producers is defined as those persons, firms and corporations who own leasehold interests in oil and gas leases who "deliver, have delivered or will deliver helium contained in gaseous streams *directly or indirectly* to Panhandle Eastern Pipe Line Company, which helium has been, is being, or will be removed and delivered by . . . National Helium Corporation into the possession of the United States of America at the delivery point described in that certain contract between the United States and National Helium Corporation dated October 13, 1961." [Emphasis supplied.]

Likewise, the class of landowners in the National Helium case has been defined as those persons and corporations owning a mineral interest in land "from which helium has been, or is being, or will be severed from the ground in connection with or because of production under oil and gas leases, which helium has been, is being, or will be taken into possession by the United States . . . in Seward County, Kansas," pursuant to the contract between the United States and National Helium Corporation dated October 13, 1961.

1. *Status of Atlantic Richfield Company; Northern Natural Gas and ElPaso Natural Gas Company Gas Exchange Agreement.* [USX 38 (a), 38(h); Hanley 14:1487 et seq.]

Northern Natural Gas Company received gas from ElPaso Natural Gas Company in north-central Grant County, Kansas, under the terms of a gas exchange agreement dated March 11, 1965.

This gas had previously been purchased by ElPaso from wells in the Hugoton Field owned by Atlantic Richfield Company. Northern Natural Gas, itself, had no contractual relationship with Atlantic Richfield.

Northern Natural Gas Company repaid ElPaso for this gas by delivery of equal amounts of gas to ElPaso in Yoakum County, West Texas.

About 8 or 9 miles directly north of where Northern Natural Gas received gas from ElPaso, some of the ElPaso gas is diverted for delivery to Kansas-Nebraska Pipeline Company, in exchange for other gas received by Northern from Kansas-Nebraska near the Liberal compressor station in Seward County, Kansas. This delivery to Kansas-Nebraska includes part of the Atlantic Richfield gas.

The Kansas-Nebraska pipeline goes on North to Scott City, where it serves the private Sunflower helium extraction plant owned by Cities Cryogenics.

Part of the gas received from ElPaso is processed through the Northern Helex plant at Bushton, Kansas, and part is processed for helium extraction through the private, non-conservation Sunflower Plant at Scott City, which is partially owned by Kansas-Nebraska. Some of the ElPaso gas is also used as compressor station fuel at Holcomb and Burdette, Kansas, and is never processed by anyone for the extraction of helium.

■ The Court fully appreciates the complex nature of these arrangements, but the Court is of the opinion, and so finds, that Atlantic Richfield has established to the Court's satisfaction that a portion of its production was in fact processed at the Northern Helex plant in Bushton, Kansas, that helium was extracted from gas produced by Atlantic Richfield, and that that helium was thereafter sold to the United States, pursuant to the contract between Northern Helex and the United States. Under such circumstances, the Court finds that

Atlantic Richfield is within the class of Lessee-Producers, defined in Case No. KC–1969, who delivered "helium contained in gaseous streams *directly or indirectly* to Northern Natural Gas Company" from which the helium was removed by Northern Helex and delivered into the possession of the United States pursuant to the conservation contract, dated August 15, 1961.

■ Northern Helex must account to Atlantic Richfield only for that portion of gas which passed through the Northern Helex plant. Atlantic Richfield is not entitled to any payment in this action for the helium content in portions of gas which were diverted to Kansas-Nebraska and thereafter processed in the Scott City extraction plant, or for portions of its gas which may have been consumed as fuel in compressor stations. While computations necessary to ascertain what portion of the Atlantic Richfield gas was ultimately processed for extraction of helium at Bushton, Kansas may be difficult, the Court does not believe that these computations are impossible, and the Court expects the parties to cooperate in arriving at ultimate figures, in accordance with its discussion, *infra*, concerning proper accounting procedures. Atlantic Richfield will, of course, be accountable to its landowners for payment of proper royalties attributable to payments received for the helium constituent extracted at the Northern Helex plant.

### 2. *Panhandle-Eastern Gas Exchange Contracts.*

[10] As previously noted, Panhandle Eastern obtained large volumes of gas under 22 gas exchange agreements with various producers and other pipeline companies. [PEX 2, Contracts Nos. 9001 through 9022] [44] The Court has examined these gas exchange contracts in some detail and will agree with Panhandle's contention that they are quite complex, and contemplate an exchange of gas for gas, apparently for convenience and without any particular profit motivation. However, Panhandle-Eastern admits that a large volume of the gas serving the National Helex plant was obtained by Panhandle through gas exchange agreements,[45] and it is readily apparent that helium was extracted from that gas and sold and delivered to the United States pursuant to National's conservation contract.

The Court accordingly finds, as it did in the case of Atlantic-Richfield, that those Lessee-Producers who delivered helium bearing natural gas, *directly or indirectly* to Panhandle Eastern Pipe Line Company, pursuant to these gas exchange agreements, from which helium was thereafter removed by National Helex and sold and delivered to the United States, are members of the Lessee-Producer class defined in Case No. KC–1980. The Court notes that each gas exchange agreement is specifically tied to production from named wells, and while the accounting may be difficult, the Court does not believe it to be impossible. As in the case of Atlantic-Richfield, those Lessee-Producers entitled to share in the fund derived from sales of crude helium by National Helex, shall account for and pay proper royalties to landowners in accordance with this Court's instructions.

### 3. *Production From Wells Owned by Panhandle Eastern.*

■ As previously noted, approximately one-third of the gas which was processed for helium extraction at the National Helex plant was produced from

---

44. Gas exchange agreements were made with Cities Service Gas Company, Colorado Interstate Gas Company, ElPaso Natural Gas Company, Kansas-Nebraska Natural Gas Company, Natural Gas Pipe Line Co., Northern Natural Gas Company, Phillips Petroleum Company, Anadarko Production Company, Trans-Western Gas Interstate Company, and Peoples Natural Gas Company.

45. In its post trial brief (Dkt. 1703, p. 89) Panhandle asserts that nearly one-half of the volume of feedstock to the National Helex plant was derived from exchange gas, gas acquired from Phillips Petroleum Company, and gas acquired from Panhandle's own wells.

wells owned by the pipeline company which supplied National, that is Panhandle Eastern. As to this production, Panhandle contends that "any claims by the landowners who were lessors to Panhandle are outside the jurisdiction of the Court in this case."

It is the finding of this Court that the Landowners owning mineral interests in lands from which Panhandle Eastern produced helium bearing natural gas, which was ultimately processed for the extraction of helium in the National Helex plant, are clearly within the class of Landowners defined in Case No. KC–1980.

The Court further finds that Panhandle Eastern itself, willingly, or unwillingly, comes within the definition of the class of Lessee-Producers entitled to share in the fund derived from sales of crude helium to the United States by National Helex, since it in effect delivered gas to itself from which helium was extracted and sold to the United States.

It does not matter to this Court what Panhandle Eastern does with proceeds payable from its own subsidiary, National Helex, upon an accounting for payment for the helium constituent of gas derived from its own production. However, as a Lessee-Producer, supplying gas which found its way through the National Helex plant, it must make proper accounting for royalties due its landowners for the value of extracted helium. To rule otherwise would enable National Helex to avoid accounting for the value of approximately one-third of the helium sold to the United States, which would in the Court's opinion, violate the intent of the Mandate of the Court of Appeals, and would only invite further decades of endless litigation.

4. *Producers Who Disclaimed Interest in Helium.*

a) *Panhandle Eastern Contracts Nos. 152, 284, 435, 767, 919, 978* [PEX 2]

Panhandle Eastern is the purchaser of gas under six contracts in which the sellers retained the right to extract the helium content of the gas stream, and waived claim to the helium or promised indemnity in the event they failed to exercise their option. These contracts appear in PEX 2, as follows:

Contract No. 152, 3/24/60 with Cities Service Oil Company

Contract No. 284, 5/19/66, Ashland Oil & Refining Company

Contract No. 435, 4/14/67, Cabon Corporation

Contract No. 767, 1/22/60, Republic Natural Gas Company, now Mobil Oil Corporation

Contract No. 919, 4/6/60, United Producing Company, Inc., now Ashland Oil & Refining Co.

Contract No. 978, 7/3/63, Texaco, Inc.

In Contract No. 152, the producer retained the option of extracting helium and liquefiable hydrocarbons, and promised that: "In the event Seller does not extract helium at the plant site or sites . . . or prior to initial delivery of gas to Buyer, Seller will release all further claim to helium contained in gas delivered to Buyer." [Contract No. 152, ¶ 12.3 p. 24]

In Contracts Nos. 435, 767 (¶ 12.3), and 978, the producers also retained the right to extract helium, and these contracts contain provisions similar to that found in Contract No. 152, releasing all future claim to helium.

In Contract 284 (¶ 15.1, Warranty of Title) the producer agreed to "remove the helium constitutent prior to delivery of the gas . . . or, failing to do so, shall indemnify Buyer pursuant to the warranty provisions hereof, for all gases, of whatsoever nature, actually delivered to Buyer."

In Contract No. 919 (Article II, ¶ 2.-1(f)) the producer retained the option to extract helium and/or liquefiable hydrocarbons, but has failed to exercise this option in any way. Surprisingly, none of the producers in any of these six contracts has elected to construct a $20 million helium extraction plant for

the purpose of removing helium for its own account, prior to delivery of the gas stream to Panhandle Eastern. [Dixon 19:2068–2073]

All of the Lessee-Producers who sold gas to Panhandle pursuant to these six contracts are members of the Lessee-Producer class defined in the National Helex interpleader case, No. KC–1980. This Court determines that they are entitled to share in the allocation of the fund derived from sales of crude helium to the United States by National Helex, notwithstanding provisions contained in the gas purchase and sales contracts described above.

The Court believes that this result is required under the Mandate of the Court of Appeals. The title question of this helium case is closed insofar as it has been determined that the oil and gas leases, and the gas purchase contracts conveyed title to the helium constituent of the natural gas stream to the Helex Companies. The Court of Appeals has ruled that the Helex Companies have received a valuable commodity without paying for it, and that, the pipeline companies and their Helex subsidiaries may not retain their "windfall." We believe that justice requires that the Helex Companies be accountable to Lessee-Producers in situations similar to that found in these six contracts. It is obvious to the Court that the economics of the helium industry are such that no producer in a similar situation will be able to extract helium for its own account, before delivering gas over to the pipeline company. It is also apparent to the Court that the language appearing in these contracts was inserted simply to protect the pipeline company's title to the helium constituent, which title, as the Court well remembers, was a matter of considerable concern and controversy

during the 1960's when these gas purchase contracts were negotiated.

b) *Status of Phillips Petroleum Company Cases Nos. KC–1969 and KC–1980.*

Panhandle Eastern obtains large volumes of gas under purchase contracts with Phillips Petroleum. The Court has previously ruled that Phillips is a member of the Lessee-Producer classes in Cases Nos. KC–1969, KC–1980, despite its efforts to remove itself from litigation. [Dkt. 1614].

Again, in light of the Mandate of the Court of Appeals, and in accordance with the discussion, *supra,* relating to releases of claims to helium, the Court concludes that Phillips, as a member of the Lessee-Producers class, is entitled to share in the funds derived from sales of crude helium to the United States by National Helium and Northern Helex, notwithstanding Phillips' oral and written statements of position made during the previous trial and controversy concerning title to the helium constituent.

c) *Release by Hugoton Production Company*

 Panhandle purchased large volumes of helium bearing natural gas from Hugoton Production Company under the terms of a gas purchase contract dated May 1, 1962. [PEX 2, Contract 1500] A dispute arose between the parties, which was finally resolved by execution of a release dated May 1, 1967, wherein Hugoton released Panhandle and others from any and all claims whatever that Hugoton may have had, "from the beginning of the world" up to the date of the release.[46]

As in the case of contracts wherein producers specifically released claims upon helium, the Court determines that

---

46. Hugoton released Panhandle:
"from all, and all manner of, action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, bonds, bills, specialities, covenants, contracts, controversies, agreements, promises, trespasses, judgments, executions, claims and demands whatsoever, in law or in equity, that the said Hugoton now has, ever had, or may have by reason of any matter, cause or thing whatsoever from the beginning of the world up to and including the end of the day upon which this release is dated. . . . "

the release executed by Hugoton Production Company does not bar it as a member of the Lessee-Producer class who delivered gas to Panhandle Eastern Pipeline Company which was subsequently processed for helium extraction in the National Helex plant, and National Helex will be required to account to Hugoton Production Company notwithstanding the release executed for the benefit of Panhandle Eastern.[47]

### d) *Counterclaims of Pipe Line Companies.*

 Cities Service Gas Company and Northern Natural Gas Company, for themselves, or for the account of their subsidiaries, the Helex Companies, seek set-offs against sums payable to Lessee-Producers in amounts attributable to the volumetric measure of helium contained in the natural gas stream. It is the position of the pipeline companies that they have already paid the Lessee-Producers for all volumes of natural gas, including the helium constituent, and that they are entitled to subtract amounts already paid under FPC service rates which are attributable to this helium constituent. Thus, in proposed findings submitted by the Cities Helex group, Dkt. 1705, p. 84, it is asserted that they are entitled to a credit of $29,543.51 for helium production during the period of July 1963 through December 1971.

The Court determines that these counterclaims should be disallowed.

The Court believes that prices paid by the pipeline companies under the gas purchase contracts, for the whole gas stream are irrelevant to a determination of the liability of the Helex extracting companies to account for the reasonable value of helium which was sold to the United States. Theoretically at least, the Helex extractors, and the pipeline companies are separate entities, and the rights of each were governed by separate contractual arrangements. In the case of the pipeline companies, by the gas purchase contracts; in the case of the Helex group, by their separate processing agreements with the pipeline companies. In the title phase of this litigation, it was determined that the pipeline companies obtained title to all of the components of the natural gas stream upon payment of rates specified in the gas purchase contracts or determined by FPC area rates. The pipeline companies bought the *entire* gas stream and the Court finds that they are not entitled to a "refund" of a portion of the purchase price which may be attributable to the helium constituent of that stream.

### M. *Accounting Procedures.*

 While varying from field to field and well to well, the helium content in the gas produced from a given well remains fairly constant over the years. [Russell 9:957–958]

While testing data was not available from every well affected, the Court accepts evidence offered jointly by the Lessee-Producers and Landowners as reasonably establishing the helium content of the gas at the wellheads or central delivery points here involved, either as a result of tests of the helium content at such point, or by accepted engineering and geological practices. In this respect, the Court accepts and incorporates by reference in these findings, the relative percentages of volumes of helium reflected in "helium content maps" appearing as Landowners Exs. 2–1, 2–1A, 2–2, and 2–2A, and as sponsored by the witness Russell, 9:955 et seq.

47. The Court's determinations made upon special issues raised by Panhandle Eastern concerning National's accountability for gas produced from the pipeline's own wells, and for gas received and processed through gas exchange contracts, will apply equally to parties similarly situated in the other interpleader suits.

The Court's determinations with reference to releases, and language appearing in gas purchase contracts releasing claims to helium will likewise apply to those similarly situated in all of these interpleader cases.

Although the helium content of gas produced from various wells upstream from central delivery points, such as the tailgate of a gasoline plant, or at the end of a gathering system, have not been determined in every instance, the Court expects the parties to be able to determine helium percentages by similar methods, without difficulty. [Russell 9:964–965]

The Court likewise accepts, and incorporates into these findings, evidence offered by the Lessee-Producers and Landowners allocating volumes of extracted helium back to Lessee-Producer delivery points. This evidence consists of computer runs appearing as Lessee-Producer Exhibits 2–26A through 28G. The Court finds that these exhibits reasonably and fairly allocate to each of the described delivery points the extracted volumes of helium which have been delivered to the United States for the period 1963 through 1971 under the conservation contracts. [Dunn 6: pp. 638–670; 7: pp. 675–687] The Court expects the parties to resolve between themselves any errors or discrepancies which may appear in Lessee-Producers exhibits occasioned by erroneous information supplied by the Helex Companies. E. g., McEntire 19:2169–2176; PEX 8, 10, 66.

The value of the helium at each delivery point is to be determined by multiplying the yearly volume of helium delivered at such point by each Lessee-Producer, and subsequently sold (as shown by such computer runs) times the value of commingled helium as heretofore determined for each year.

In most instances, the delivery points shown on the computer runs are well-head delivery points. In a few instances, the delivery is made from the outlet of gathering systems, or gasoline plants. In such latter instances, well-head allocations not now made, shall be calculated by the same methods and formulae already utilized. [Dunn 7: p. 687]

## N. *Royalty Payments.*

■ In its prior opinion, the Court discussed the oil and gas leases pertinent to this controversy. At the time they were executed, both the landowners and the producers were equally ignorant of the presence of helium in natural gas.

The gas royalty percentages in the leases arose out of the economics of ordinary natural gas operations, and reflect historical costs and returns, including a consideration of values of natural gas used principally as a fuel. Royalties under oil and gas leases vary according to the risk assumed, and rewards to be expected by the lessee. The evidence shows that nationwide royalty rates vary from 10% to 95%, based upon the expectations and bargaining power of the parties involved. In the Hugoton Field, royalty rates have gone as high as 9/16ths. [Keplinger 9:984–993]

In the Pinta Dome Field in Arizona, the United States, occupying the position of a knowledgeable landowner, obtained a royalty of 60% on gas useful only for helium. [Keplinger 9:994]

The helium wellhead values which the Court has here established are attributable to two factors: 1) the existence of underground deposits of helium, and 2) the leasehold production. The landowners have contributed the helium in the deposit, and the producers have contributed their efforts in producing the commodity as a part of the natural gas stream. The helium involved in this litigation became available as a valuable commodity only as a result of the two factors—the existence of the helium deposits, and the producer's reduction of the deposit to possession.

In the absence of any evidence indicating that there were appreciable additional producer costs attributable to the value of the helium here involved, the Court determines that a royalty of 50% is a reasonable measure of the respective contribution of the landowners-lessors in these actions.

In any event, a helium royalty of 50% is fair and reasonable under all of the circumstances, and the Court finds that such royalty is necessary and sufficient to prevent undue enrichment of Lessee-Producers upon distribution of the fund representing the reasonable value of commingled helium which was extracted and sold to the United States by the Helex companies in these actions.

### O. Interest.

▇▇▇ After remand of these cases by the Court of Appeals, the object of this phase of the litigation is to assure that just compensation be paid to Lessee-Producers and to their respective royalty owners for the helium in the gas processed by the Helex Companies. The Court believes that an award of pre-judgment interest is required in order to assure this result.

In Lippert v. Angle, *supra*, 211 Kan. 695, 508 P.2d 920, the Court held that lessors were entitled to such interest at the rate of 6% per annum on royalties due from the time of their accrual. In Navajo Tribe of Indians v. United States, *supra*, 364 F.2d 320, 345–346, the Court found that property had been taken without just compensation, and awarded interest on additional payments found to be due the Tribe for its interest in the helium bearing natural gas in the Rattlesnake Field. In Phillips Petroleum Co. v. Oldland (10th Cir. 1951), 187 F.2d 780, the Tenth Circuit sustained the power of the district court, in the exercise of its discretion, to award interest upon equitable considerations, ruling that the mere fact that the validity of a claim was in dispute did not preclude recovery of interest.

Under the circumstances present in this litigation, the Court finds that an award of interest at the rate of 6% per annum on the reasonable value found for each plant for each year, should be awarded.

### CONCLUSIONS OF LAW

1. The Helex Companies are accountable in these interpleader actions for the reasonable value of that helium which they have extracted and delivered to the United States under the conservation contracts.

In the case of Northern Helex, the accounting shall include all deliveries of crude helium to the United States through the first 27 days of March, 1971, and payments received by Northern from the United States of $8,671,631.99, on or about January 14, 1971, and of $2,285,872.87, on or about June 23, 1971, which this Court deems to have been paid for deliveries of crude helium pursuant to the conservation contract.

2. Each Helex company shall account on an annual basis for the reasonable value of commingled helium as hereinbefore determined, and in accordance with these findings and conclusions and shall deposit in the registry of this Court the sums reflected to be due by such accountings, upon the entry of judgment herein.

3. Interest at the rate of 6% per annum is awarded on the reasonable values found for each plant for each year, from the end of each year to date of judgment herein and 8% thereafter until judgment is paid.

4. For the purposes of ultimate accounting for sums due individual members of the classes of Lessee-Producers in each interpleader case, the points of delivery, the method of measurement, and the adjustments in price from time to time for the helium component of the helium bearing natural gas here in controversy are fixed by the terms of the respective gas purchase and sales agreements between the Lessee-Producers and their pipeline purchasers. In the case of helium bearing natural gas which was indirectly delivered to the pipelines involved in this litigation, the points of delivery, and method of measurement shall be fixed by the terms of the respective gas exchange agreements between the parties to such gas exchange agreements, or under such instruments as may have given over possession of such gas to these pipeline companies.

Determinations made on final accounting of sums to be awarded individual members of the Lessee-Producer and Landowner classes shall be made so far as is possible according to this Court's directions in Paragraph M of these findings.

5. Distributions from the funds to members of the Lessee-Producer classes, shall be made subject to payment of 50% of such proceeds as royalty payments to members of the Landowner classes, in accordance with proportionate shares attributable to the individual mineral interests of each such landowner, as the case may be.

6. Determination of the right of each individual member of the Lessee-Producer and Landowner classes defined in each interpleader action, to share in final distribution of the funds, shall be determined in accordance with this Court's directions in Paragraph L of these findings.

7. All funds paid into the Court shall remain under supervision of the Court, and subject to further Order with reference to taxation of costs.

The Court directs that a proposed form of Judgment be prepared, circulated and submitted in accordance with the findings and conclusions of this Court. It is ordered that notice shall be given in the same manner as previously to absent members of each of the classes within sixty (60) days from this date, of the proposed judgment to be entered, and notice of the amounts for attorneys fees claimed against the fund by the respective parties, and that a final hearing be fixed, at which absent members of the classes may be afforded the right to present evidence or arguments on any issue determined herein. It is further ordered that at such final hearing, the class representatives may present such evidence as desired with reference to a determination to be made by the Court concerning taxation of costs and claims for attorneys' fees.

## JUDGMENT ON REMAND

These six consolidated interpleader actions having come on regularly for trial upon remand from the decision of the United States Court of Appeals for the Tenth Circuit (reported at 441 F.2d 704) and the evidence of the parties having been submitted herein, and the Court having made its Memorandum of Opinion, Findings of Fact and Conclusions of Law Upon Remand (which is incorporated herein by this reference thereto), it is ordered, adjudged and decreed as follows:

1. That the primary question to be determined in the present proceedings, as directed by the remand, is the reasonable value of the helium content of the helium-bearing natural gas at the time and at the point that such helium-bearing natural gas was delivered to Northern Natural Gas Company, Cities Service Gas Company, and to Panhandle Eastern Pipe Line Company and which helium content was subsequently extracted by the plaintiffs in interpleader and delivered to the United States under contracts between the United States and Northern Helex, Inc. (formerly Helex Inc.) dated August 15, 1961; between the United States and Cities Service Helex, Inc. executed August 22, 1961, and between the United States and National Helium Corporation dated October 13, 1961.

2. That the reasonable value of such helium content at the time and at the point it was delivered to the pipeline companies was as follows:

| 1961 | 60 cents per Mcf of helium |
| 1962 | 61 cents per Mcf of helium |
| 1963 | 62 cents per Mcf of helium |
| 1964 | 63 cents per Mcf of helium |
| 1965 | 64 cents per Mcf of helium |
| 1966 | 65 cents per Mcf of helium |
| 1967 | 66 cents per Mcf of helium |
| 1968 | 67 cents per Mcf of helium |
| 1969 | 68 cents per Mcf of helium |
| 1970 | 69 cents per Mcf of helium |
| 1971 | 70 cents per Mcf of helium |
| 1972 | 70 cents per Mcf of helium |

3. That the named "Lessee-Producer" defendants in KC–1969 are Ashland Oil & Refining Company, Cities Service Oil Company, Gulf Oil Corporation, Helmerich & Payne, Inc., Mapco Production Company (successor to Hugoton Plains Gas and Oil Company), Mobil Oil Corporation, Texaco, Inc., and Phillips Petroleum Company, appearing individually and as representative of a class of Lessee-Producer defendants described as:

" . . . the persons, firms and corporations denominated 'lessee-producers' who are the owners of leasehold interests in the oil and gas leases from which gas is produced for delivery to Northern Natural Gas Company and who deliver, have delivered or will deliver helium contained in gaseous streams directly or indirectly to Northern Natural Gas Company, which helium has been, is being or will be removed and delivered by plaintiff in interpleader Northern Helex Company, into the possession of the United States of America at the delivery point described in that certain contract between the United States and Northern Helex Company (formerly Helex, Inc.) dated August 15, 1961."

4. That the named "Lessee-Producer" defendants in KC–1945, KC–1946, KC–1947, and KC–1948 are Mobil Oil Corporation, Ashland Oil & Refining Company, Cities Service Oil Company (formerly Columbian Fuel Corporation) and Amoco Production Company (formerly Pan American Petroleum Corporation), appearing individually and as representative of a class of Lessee-Producer defendants described as:

" . . . the persons, firms and corporations denominated 'lessee-producers' who are the owners of leasehold interests in oil and gas leases productive of helium-bearing natural gas and who deliver, have delivered or will deliver helium contained in such gaseous streams directly or indirectly to Cities Service Gas Company, which helium has been, is being, and will be removed and delivered by plaintiff in interpleader, Cities Service Helex, Inc., into the possession of the United States of America at the delivery point described in that certain contract between the United States of America and Cities Service Helex, Inc., dated August 22, 1961."

5. That the named "Lessee-Producer" defendants in KC–1980 are Ashland Oil & Refining Company, Cities Service Oil Company, Cabot Corporation, Cities Service Oil Company (formerly Columbian Fuel Corporation), Gulf Oil Corporation, Helmerich & Payne, Inc., Mobil Oil Corporation, Amoco Production Company (formerly Pan American Petroleum Corporation), Diamond Shamrock Corporation (successor to the Shamrock Oil and Gas Corporation), Texaco, Inc., Dorchester Gas Producing Company, and The Superior Oil Company, appearing individually and as representatives of a class of Lessee-Producer defendants described as:

" . . . the persons, firms and corporations denominated 'lessee-producers,' who are the owners of leasehold interests in the oil and gas leases (from which gas is produced for delivery to Panhandle Eastern Pipe Line Company) and who deliver, have delivered or will deliver helium contained in gaseous streams directly or indirectly to Panhandle Eastern Pipe Line Company, which helium has been, is being or will be removed and delivered by plaintiff in interpleader National Helium Corporation into the possession of the United States of America at the delivery point described in that certain contract between the United States and National Helium Corporation dated October 13, 1961."

6. That the named "Landowner" defendants in KC–969 are Ralph Grounds, et al. and Oliver S. Brown, et al., being approximately 560 named individuals appearing individually and as representa-

tives of a class of Landowner defendants described as:

" . . . the persons, firms and corporations owning a mineral interest in land from which helium has been, is being or will be severed from the ground in connection with or because of production under oil and gas leases, which helium is being or will be taken into the possession by the United States of America in Ellsworth County, Kansas, at the delivery point described in that certain contract between the United States of America and plaintiff in interpleader Northern Helex Company (formerly Helex, Inc.) dated August 15, 1961."

7. That the named "Landowner" defendants in KC–1945 are O. W. Heger, et al. and Oliver S. Brown, et al., being approximately 700 named individuals; in KC–1946 are Vivian W. Scheutt, et al., J. W. Teater, Guy T. Miller, Marjorie S. Maser, Marion S. Pfeiffer, Federal Land Bank of Wichita, and Oliver S. Brown, et al., being approximately 210 named individuals; in KC–1947 are Katherine R. Adams, et al., and Oliver S. Brown, et al., being approximately 210 named individuals; and in KC–1948 are Bloyd Burgess, et al., and Oliver S. Brown, et al., being approximately 110 individuals appearing individually and as representatives of a class of Landowner defendants described as:

" . . . the persons, firms and corporations owning a mineral interest in land from which helium has been, is being or will be severed from the ground in connection with or because of production under oil and gas leases, which helium has been, is being or will be taken into possession by the United States of America in Grant County, Kansas, at the delivery point described in that certain contract between the United States of America and plaintiff in interpleader Cities Service Helex, Inc., dated August 22, 1961."

8. That the named "Landowner" defendants in KC–1980 are Ralph Grounds, et al., and Oliver S. Brown, et al., being approximately 550 named individuals, individually and as representatives of a class of Landowner defendants described as:

" . . . the persons, firms and corporations owning a mineral interest in land from which helium has been, is being, or will be severed from the ground in connection with or because of production under oil and gas leases, which helium has been, is being or will be taken into possession by the United States of America in Seward County, Kansas, at the delivery point described in that certain contract between the United States of America and plaintiff in interpleader National Helium Corporation, dated October 13, 1961."

9. That judgment is hereby entered against the respective plaintiff Helex Companies for, and requiring them to pay into the registry of the Court, in their respective interpleader cases, on an annual basis to the nearest accounting date to January 1, 1972, as shown in the evidence and in accordance with the Court's findings and conclusions, to the Lessee-Producers and the members of the respective classes which they represent, as their interests may appear, the reasonable value of the helium as described herein, together with interest thereon at the rate of six per cent (6%) per annum from the end of each year to the date of this judgment and at a rate of eight per cent (8%) thereafter on the total of said principal amounts and said pre-judgment interest thereon, until such sums are paid into the registry of the Court.

10. That the plaintiff Helex Companies shall deposit in the registry of this Court the sums reflected to be due by such accountings. All funds paid into the Court shall remain under supervision of the Court, and subject to further Order with reference to the ultimate disposition thereof as herein provided.

11. That the Lessee-Producer defendants, including Panhandle Eastern Pipe

Line Company, as a Lessee-Producer, shall account on such annual basis and in accordance with the Court's findings and conclusions to the Landowners and the members of the classes which they represent, as their interests may appear, for fifty per cent (50%) of the amounts accounted for by the Helex Companies to the Lessee-Producers in accordance herewith and the findings and conclusions, which accounting shall be subject to the approval of the Court after notice and hearing.

12. *The Court retains jurisdiction of the fund consisting of the "money paid and to be paid by the United States to the Helex Companies for the helium-gas mixture"* delivered to the United States under contracts between the United States and Cities Service Helex, Inc., dated August 22, 1961, and between the United States and National Helium Corporation dated October 13, 1961, pending all necessary further proceedings herein in connection with an accounting for the reasonable value of helium subsequent to the accounting period set forth in Paragraph 9 hereof and for the purpose of making distribution out of such fund in accordance with the Court's orders to be made pursuant to Paragraph 13 following.

13. The parties shall, at a time to be hereafter determined by the Court, after this Judgment is no longer subject to appeal, file with the Clerk of this Court their respective claims for costs and litigation expenses, including attorney fees, which claims shall be allowed and paid in amounts found proper by the Court, according to guidelines provided in the prior order of this Court on 6/11/69 [Dkt. 1372] and after a hearing thereon, in the manner and upon such notice as the Court shall hereafter determine.

Payment thereof shall be made out of the fund consisting of "the money paid and to be paid by the United States to the interpleading plaintiffs for the helium-gas mixture produced and sold by them" to the United States under the contracts described in Paragraph 12 above, *over and above* that portion thereof to be accounted for pursuant to Paragraph 9 above.

14. That all claims, counter-claims, cross-claims, issues or contentions submitted by the respective parties and attached to the Pre-Trial Order filed January 9, 1974, and Appendices thereto, and not herein disposed of, are deemed to have been by the Court denied or overruled.

## ORDER ON MOTIONS

Following entry of Judgment upon Remand [Dkt. 1738] and Order on Redetermination of Fees and Costs [Dkt. 1739] entered in the records of this Court on December 16, 1974, in these cases, numerous motions have been filed by the parties to alter and amend such judgment and order.

After review of these motions, and consideration of briefs filed in support of suggested alterations and amendments in the Court's orders, the following determinations are made.

A. *Motions to Strike References in Order Concerning Fees and Costs* [Dkt. 1750]

Motions have been filed by Landowners [Dkt. 1750], Mobil Oil Corporation and Mapco, Inc. [Dkt. 1752], Amoco Production Company [Dkt. 1755], and Diamond Shamrock Corporation [Dkt. 1756] to strike from the Court's order regarding a redetermination of fees and costs, those portions which make specific reference to "claims" made by the parties for attorneys' fees in connection with a hearing had on that issue in June, 1969. In particular, the parties object to the Court's references to rates of "$100 per day", or "$10 per hour."

In its most recent order concerning fees filed on December 16, 1974, the Court believes that it clearly stated that no determination or order would be made at this time concerning what would be a "reasonable fee," and the Court's order clearly contemplates that

new applications for allowance of fees and costs will be filed after appellate review is concluded in these cases. The Court specifically noted that any tentative rulings concerning fees were not binding in any manner at this time.

For these reasons, the various motions to strike references in the order concerning redetermination of fees will be overruled.

B. *Motion of United States to Amend Judgment Filed December 16, 1974* [Dkt. 1754]

The United States objects to the Court's finding that for the purpose of Case No. KC–1969, two payments made by the United States of $8,671,639.99 on January 14, 1971, and of $2,285,872.87, made on June 23, 1971, constitute payment for deliveries of crude helium, and as such, constitute a portion of the Fund which is the subject matter of Case No. KC–1969. It is suggested that the status of these payments should await final determination of the controversy between Northern Helex Company and the United States, pending in the Court of Claims.

The Court determined as a matter of fact that, for the purposes of Case No. KC–1969, the two payments in question constituted a portion of the Fund in that case. The Court believes this finding to be correct and entirely appropriate at this point, inasmuch as it has assumed jurisdiction over the "Fund" which is the subject matter of KC–1969. If the United States believes this finding of fact to be in error, it may seek review of this Court's determination of this issue on appeal.

The Motion of the United States to amend the judgment will be overruled.

C. *Motion of Helex Companies to Alter or Amend Judgment on Remand* [Dkt. 1751]

The Helex companies contend that the Judgment prepared and entered by the Court on December 16, 1974 should be amended to: 1) "clarify the inconsistency between the Judgment on Remand and the Memorandum Opinion . . . . entered November 12, 1974" with reference to taxation of costs and notice to members of the Class; 2) by striking the allowance for prejudgment interest, upon the ground that under Kansas law there can be no compounding of interest; and 3) by adding to the Judgment on Remand the express language contained in Rule 54(b) "That there is no just reason for delay and it is expressly directed that this Judgment on Remand be entered."

When the Court prepared its Memorandum, Findings of Fact, and Conclusions of Law, it was contemplated that the parties would be able to prepare and submit a proposed Judgment in accordance with those findings. Some controversy arose as to whether or not it was even necessary to file a formal Judgment, inasmuch as the Court of Appeals, in remanding the case, had retained jurisdiction of the matter. In order to expedite an orderly appeal from this Court's findings, the Court thereafter determined that it should prepare and file a formal Judgment. With the additional order filed the same date as the Judgment, concerning a determination of costs and fees, the Court believes that the appellate tribunal will now have before it for review all relevant issues, save those dealing with the ultimate accounting, assessment of costs and fees, and final distribution of the Fund. Prior to that, the Court contemplates that proper notices will issue to all absent members of the various classes.

The Court believes its views regarding the award of pre-judgment interest are adequately set out in the Memorandum and Judgment, and the Helex companies will have ample opportunity to have these determinations reviewed by the appellate court.

The Court likewise declines to amend its Judgment for the purpose of directing that the Judgment on Remand "be entered". It has been filed and entered in the Records of this Court.

For the foregoing reasons,

It is ordered that the Motions of Landowners, Mobil Oil Corporation, Mapco, Inc., Amoco Production Company, and Diamond Shamrock Corporation [Dkts. 1750, 1752, 1755, 1756] to Strike References in Order Concerning Fees and Costs heretofore entered on December 16, 1974, be, and they are hereby overruled;

It is ordered, that the Motion of the United States to Amend Judgment on Remand [Dkt. 1754] be and it is hereby overruled; and

It is further ordered that the Motion of the Helex companies to Alter or Amend the Judgment on Remand [Dkt. 1751] be, and it is hereby overruled.